AMORY MANUFACTURING COMPANY V. GULF, COLORADO & SANTA FE
RAILWAY COMPANY.

No. 398.—Decided March 26, 1896.

**Carrier—Bill of Lading Construed—In Transit.**

Cotton on the platform of a compress company near the railroad track was destroyed by fire. While on the platform the railway company executed a bill of lading binding itself to transport the cotton to Manchester, N. H., and containing the following clause: "The packages aforesaid (the cotton) must pass through the custody of several carriers before reaching their destination; and it is understood, as a part of the consideration for which said packages are received, that * * * neither this company nor any of said carriers while in transit, or while in depot or place of trans-shipment or of landing at place of delivery, shall be liable * * * for loss or damage to hay, hemp, cotton, etc. * * * " In suit for the value of the cotton, held, that while upon the platform where burned it was not in transit nor at a depot or place of trans-shipment: and that the railway company was liable for the loss." (Pp. 424 to 427.)

ERROR to Court of Civil Appeals for Fourth District, in an appeal from Dallas County.

The suit was brought by the Amory Mfg. Co. to recover from the railway company the value of the burned cotton. The trial court found that defendant was not negligent and was exempt from liability as a carrier under the terms of the bill of lading, and gave judgment for defendant. Plaintiff appealed, and the judgment being affirmed by the Court of Civil Appeals, prosecuted writ of error.

*Coke & Coke,* for plaintiff in error.—What is the proper interpretation of the term "in transit" as it occurs in the following clause in the bill of lading sued on, viz.: "* * * and especially that neither this company (the defendant in error) nor any of said carriers, while in transit, or while in depot or place of trans-shipment, or of landing at place of delivery, shall be liable for loss or damage of * * * cotton."

(1) In the interpretation and construction of a contract, as of a statute, the rules to be kept in view are: (a) The intention, as collected from a consideration and comparison of the entire contract, is to be reached as near as can be. But this must be understood with limitations. The rule of law is, not that the court will always construe a contract to mean what the parties to it meant; but rather that the court will give to the contract the construction which will bring it as near to the actual meaning of the parties as the words they saw fit to employ, when properly construed, and the rules of law will permit. Parsons on Contracts, 495. It is also to be kept in mind that, though the first question in all cases of contract is one of interpretation and intention, yet the question, as we have already remarked, is not what the parties may have secretly and in fact intended, but what meaning did they intend to convey by the words they employed in the written instrument. Greenleaf on Ev., sec. 282.

(b) The language of a contract should be given its ordinary and pop-

ular meaning—unless they relate to some technical subject. The bulk of mankind deal with great simplicity, and their words are to be taken in their popular and ordinary meaning, unless some good reason be assigned to show that they should be understood in a different sense. Chancellor Kent, 2 Com., 555. The language and terms of the contract will be understood in the ordinary popular sense—unless they relate to some technical subject, as a particular trade or science, the law, or a custom—in which case their technical meaning will be given them. But if, from the connection or from the subject, it is apparent that the parties did not employ them so, or according to their true definitions, they will receive the meaning thus shown to have been intended. Bishop on Contracts, sec. 404. And technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless, it must be observed, they are clearly used in a different sense; for it is obvious that if the expressions and phrases used by unprofessional men in their various negotiations were always to be taken in their technical sense, the interpretation would often violate their true intent and meaning. Lawson on Contracts, sec. 387. To the same effect: Addison on Contracts, 181; Greenleaf, sec. 278.

(c)  For the most obvious reasons words having a popular and a technical sense will be presumed to have been used in the former. Engelking v. VonWamel, 26 Texas, 471; Hawes v. Smith, 12 Maine, 429; Casler v. Ins. Co. 22 N. Y., 427; Schenck v. Campbell, 11 Abb. Pr., 292; Railway v. Veeder, 17 Ohio, 385; Schuylkill Nav. Co. v. Moore, 2 Wharton, 491; Sutherland on Interpretation of Statutes, sec. 248.

(d)  Every word in a contract must if possible be given effect and operation. Every contract ought to be so construed that no clause, sentence or word shall be superfluous, void or insignificant. Every word ought to operate in some shape or other. Addison, 181. The construction should be upon the entire instrument and not merely on disjointed parts of it; so that every part of it (if possible) may take effect. Minor's Insts., vol. 2, p. 952. Courts will examine the whole of the contract, and so construe each part with the others that all of them may if possible have some effect, for it is to be presumed that each part was inserted for a purpose and has its office to perform. * * * So every word will if possible be made to operate, if by law it may, according to the intention of the parties. Lawson, sec. 389. Every clause and every word should when possible have assigned to it some meaning. It is not allowable to presume or to concede, when avoidable, that the parties in a solemn transaction have employed language idly. Bishop, sec. 384. There is a rule universally recognized in the construction of statutes which is equally applicable to the construction of contracts. It is this: That one part of a statute must be so construed by another that the whole may if possible stand; and that, if it can be prevented, no clause, word or sentence shall be superfluous, void or insignificant. Breese, J., in McCarty v. Howell, 24 Ill., 343.

(e)  Words are to be construed most strongly against the user of them.

Verba chartarum fortius accipiuntur contra proferentem.   Language in a written contract of doubtful meaning will be construed most strongly against the person using the language or who has caused the uncertainty to exist.   Addison, 181, note 1, section 8.   Blackstone says this is a wholesome rule, and that "hereby all manner of deceit in any grant is avoided, for men would always affect ambiguous and intricate expressions provided they were afterwards at liberty to put their own construction upon them."   Vol. 2, 380.   Quoted and approved in McCarty v. Howell, above. The principle upon which the rule is founded is that in order to induce men to express themselves plainly, they are laid under the penal consequence that whatever ambiguity occurs in expressions proceeding from themselves shall be solved adversely to them.   Minor, vol. 2, 953. This rule is based on the principle that a man is responsible for ambiguities in his own expressions, and has no right to induce another to contract with him on the supposition that his words mean one thing, while he hopes the court will adopt a construction by which they would mean another thing more to his advantage.   Lawson, sec. 389, paragraph 12.

(f)   Language used by one party to a contract is to receive such a construction as he at the time supposed the other party would give it, or such a construction as the other party was fairly justified in giving it, which is the same thing.   Redfield, J., in Gunnison v. Bancroft, 11 Vt., 490; Barlow v. Scott, 24 N. Y., 40; Potter v. Ins. Co., 5 Hill, 147; Paley's Mor. & Pol. Philosophy, 104.   Parsons says the above rule, referring to Paley, "is as good in law as in ethics."   Vol. 2, 498, note "p." It may well be said the plaintiff in error understood (and was therein fully justified by the contract) the term "in transit" to mean what it now contends.

(g)   Terms in a contract in derogation of law—that is, establishing for the particular instance a rule contrary to what the law would provide—are, like provisions in a statute in derogation of the common law, construed strictly.   It is so when a common carrier undertakes to limit his liability by a special agreement with the party; he can claim nothing beyond what is plainly within the words.   Bishop, secs. 410 and 411.

(h)   The order in which the terms of a contract are written is of no consequence.   The intention is to be reached upon a consideration of the contract as an entirety.   In the opinion of the Court of Appeals in this case, on motion for rehearing, some stress seems to be laid on the fact that "in transit" comes before the other limiting terms.   In Jones v. Adams & Wickes, 64 Texas, 197, from which the court quotes, in treating of the construction of clauses in a deed, it is said:   In treating of the construction of several covenants in a deed, and as to the order in which they stood, Sergeant Williams said:   It is questionable whether much regard would now be paid to this mode of construction.   The chief object of courts of law at present is to discover the true meaning of the parties, and to construe the covenants accordingly.   While Lord Chief Justice Dallas, in Foord v. Wilson, 8 Taunt., 543, observed:   The order in which

the covenants stand, however transposed, is comparatively unimportant. Bishop says that idea that clauses take effect in the order in which they are written is "utterly destitute of practical value. * * * "It is hardly presumable that at the present day many courts would much regard this distinction. Surely in reason, as the whole of a written contract or will was executed simultaneously, there can be in it no first, no middle, no last. Contracts, section 389. So much for the rules and principles applicable to the interpretation of contracts generally.

(2) The bill of lading in question must be construed strictly and rigidly against the carrier, and the language thereof, in order to exclude its liability, should be clear and its meaning unmistakable.

(a) Why should the construction be so strict? Because the limitation is an exception and prescribes a rule different from what the law would prescribe. Because the law is jealous of the carrier's liability, the outgrowth of the wisdom of ages, and will not let him shuffle it off except by plain words to that effect. Because the contract is drawn up with care by the carrier in language selected by it, the blank form having been printed in advance ready to be presented to all persons offering property for transportation. The restrictions are for the benefit of the carrier alone. The owners of packages shipped rarely examine with care, or have an opportunity to critically examine the receipt given them, and general and indefinite terms under such circumstances are apt to mislead. Hutchinson says these are potent reasons why nothing should be understood in the carrier's favor, not clearly expressed. Section 279, Carriers. See the following authorities: Hutchinson on Carriers, secs. 237a, 270, 275 and 279; Lawson on Carriers, sec. 150; Angel on Carriers, sec. 254; Story on Bailments, sec. 556. Lawson on Bailments (1895), sec. 162, says: "While it is competent for common carriers to provide by contract for exemption from their common law liability, it must be done in clear and unambiguous language, and the rule that the language of contracts, if ambiguous, is to be construed against the party using it, is rigidly applied to such contracts." Taylor v. Steam Co., L. R. 9, Q. B., 546; Barter & Co. v. Wheeler (N. H.), 6 Am. Rep., 434; Stanard Milling Co. v. Transit Co., 26 S. W. Rep., 708 (Mo.); Deming v. Compress Co., 90 Tenn., ——, s. c. 17 S. W. Rep., 91; Edsall v. Railway, 50 N. Y., 661; Hooper v. Wells, 85 Am. Dec., 211 (Cal.); Menzell v. Railway, 1 Dillon C. C., 531; Levering v. Trans. Co., 97 Am. Dec., 320 (Mo.); Smuck v. Railway, 49 Ind., 302; Rosenfield v. Railway, 53 Am. Rep., 501 (Ind.); Ayres v. Railway, 14 Blatch., 9; Railway v. Talbot, 39 Ark., 523; s. c., 18 Am. & Eng. Ry. Cases, 598; Magin v. Dinsmore, 56 N. Y., 168; Steel v. Townsend, 79 Am. Dec., 49; Union Mutual Ins. Co. v. Railway, 1 Disney, 480; Express Co. v. Moon, 39 Miss., 832; Overland Mail Co. v. Carroll, 7 Col., 43; Railway v. Mundy, 83 Am. Dec., 339; N. J. Steam Nav. Co. v. Merchants Bank, 6 How., 344; The City of Norwich, 4 Ben., 271; Atwood v. Transportation Co., 34 Am. Dec., 504 (Penn.).

Though it is perhaps too late to say that a carrier may not accept his

charge in special terms, it is not too late to say that the policy which dictated the rule of the common law requires that exceptions to it be strictly interpreted, and that it is his duty to bring his case strictly within them. Chief Justice Gibson, in Atwood v. Transportation Co., above.    This language is quoted by the Supreme Court of California in Hooper v. Wells, above, and the court say:    "Such is the well settled rule of construction in such cases."    The same language is quoted by the Supreme Court of Missouri in Levering v. Transportation Co., and the court say: "The authorities are all to the same effect."    Chief Justice English says in Railway v. Talbot:    "Looking at the whole bill of lading we concur in the opinion of his honor, the circuit judge, that the clause quoted applies to loss by fire occurring on water, and not on the railways or in their depots.    But if the proper construction of the clause be in doubt, the doubt must be resolved against defendant, because the burden was on it to show that it had clearly contracted for exemption from responsibility for loss happening by fire."    Says Lush, Judge, in Taylor v. Steam Co., "The word is ambiguous, and being of doubtful meaning it must receive such construction as is most in favor of the shipper, and not such as is most in favor of the ship owner, for whose benefit the exceptions are framed; for if it was intended to give to it the larger meaning which is now contended for, the intention to give the ship owner that protection ought to have been expressed in clear and unambiguous language."    In Barter v. Wheeler, Bellows, C. J., says:    "We think also that to justify the finding of the discharge of the common law liability by the assent or agreement of the consignor, and especially by means of a bill of lading which is the act of the carrier alone, the terms ought to be explicit and unequivocal, and doubtful expressions ought to be taken most strongly against the carrier; and such we think has been the general doctrine both in the English and American courts."    And Bishop says, when a common carrier undertakes to limit his liability by a special agreement with the party he can claim nothing beyond what is plainly within the words.    Contracts, sec. 411.

As to the policy of this State in such matters, we refer the court to art. 278, Rev. Stats.; Ryan v. Railway, 65 Texas, 13; and Railway v. Manufacturing Co., 79 Texas, 26.

*Alexander Clark & Hall,* for defendant in error.—The loss of the cotton sued for in this case came within the limitation in the bill of lading sued upon exempting the defendant in error from liability, because the bill of lading exempted defendant in error from liability for such loss and damage to said cotton, not occasioned by the negligence of itself, or its agents or employes, "while in transit or in depot or place of transshipment, or of landing at place of delivery;" and it appearing from the evidence that said cotton was destroyed by fire under said circumstances, that is, after the bill of lading had been executed and delivered and the cotton for which it was given had been received at the usual and customary place of deposit for such cotton, that is, "compress cotton," the

court properly held that the burning of the cotton, that is, its loss, came within the clause of the bill of lading exempting defendant in error from liability.   Railway v. Sherwood, Thompson & Co., 84 Texas, 125; Railway v. Gernan & Co., 84 Texas, 141; Railway v. International Marine Co., 84 Texas, 149; Harris v. Tenney, 85 Texas, 254; Halff v. Allyn, 60 Texas, 282; Chandler v. Fulton, 10 Texas, 2; Hutch. on Carr., sec. 89; Tiedman on Sales, secs. 129 and 130; Abbott on Shipping, 520.

According to the statute of Texas, as well as according to the common law, as heretofore shown, this cotton was in transit when burned, the carrier having received the same for shipment and executed a bill of lading therefor.   The statute, Rev. Stats., art. 283, is but an adoption of the common law, and as herein applied does not burden or impede the shipment contrary to the common law, and is not in conflict with any express enactment of Congress, or with the common law, on the subject; the State law does not contravene the Constitution of the United States; hence, it is valid as to such shipment.   As to whether the cotton according to the facts in the case was "in transit."   Rev. Stats., art. 283; Friedlander v. Railway, 130 U. S., 426; also common law authorities cited above under first counter proposition.   As to whether the statute applies. Smith v. Alabama, 124 U. S., 465.

GAINES, CHIEF JUSTICE.—This suit was brought by the plaintiff in error against the defendant in error to recover the value of fifty bales of cotton.   The cotton was bought by J. H. Brown & Company and was placed upon the platform of a compress company at Honey Grove, Texas, for the purpose of being compressed.   While it was still in possession of the compress company, and upon its platform, the defendant in error executed to Brown & Company a bill of lading therefor, in which, upon certain conditions, it bound itself to transport the cotton to Manchester, New Hampshire.   After the execution of the bill of lading and while the cotton still remained upon the platform, it was destroyed by fire.   It was admitted upon the trial that at the time of the loss the cotton was the property of the plaintiff.   The trial court found that the fire was not the result of the negligence of the defendant company, and held that, by reason of certain stipulations in the bill of lading which restricted its liability as to common law, the defendant was not liable.   The judgment of the trial court was affirmed by the Court of Civil Appeals.

The errors assigned in this court are: first, that it was error to hold, that under the bill of lading the defendant was exempted from liability for the loss of the cotton while at the compress; and, second, that the evidence was not sufficient to show that the cotton was not destroyed through the negligence of the defendant.

In our view of the case, the determination of the first assignment renders a decision of the other unnecessary.   Omitting so much as has no bearing upon its construction, the special provision in the bill of lading reads as follows:

"The packages aforesaid (the cotton) must pass through the custody

of several carriers before reaching their destination, and it is understood as a part of the consideration for which said packages are received, that the exceptions from liability made by such carriers respectively in their several bills of lading for through freight shall operate in the carriage by them respectively of said packages, as though herein inserted at length; and especially that neither this company, nor any of said carriers, while in transit, or while in depot or place of trans-shipment, or of landing at place of delivery, shall be liable  *  *  *  for loss or damage to hay, hemp, cotton,  *  *  *"

In order to sustain the ruling of the Court of Civil Appeals and of the trial court, it must be held that the cotton while upon the platform of the compress company was either "in transit" or "in depot" within the meaning of these terms as used in the bill of lading. The rule is elementary that, if a written contract when viewed as a whole and in the light of the attendant circumstances reasonably admits of two constructions, that one is to be adopted which is least favorable to the party whose language it is. To no class of contracts has the rule been applied with more stringency than to those in which common carriers seek to limit their liability as it exists at common law. In general not only are the bills of lading drawn by the carrier and tendered to the shipper to be accepted by him without alteration, but they are also executed upon forms prepared for the purpose of protecting the interest of the carrier, with all the care and ability which experience in the business and professional skill can bring to bear upon the subject. The rule does not require that a strained construction should be put upon the contract of shipment, in order to favor the shipper; but rather, that in case of a reasonable doubt as to which of two constructions best accords with the intent of the parties, that should prevail which is least favorable to the carrier.

Was the cotton while on the compress platform "in transit," within the meaning of the bill of lading? It is contended upon the one side, that the words "in transit" are the equivalent of the words "in transitu," and that goods in the hands of a carrier are in transit from the moment of delivery to the carrier until they reach the hands of the consignee. In sense, the meaning of the two phrases is the same; the one is a literal translation of the other; but as actually employed they have a materially different meaning and application. "In transit" means literally, in course of passing from point to point, and such is its common acceptation. Such also is the literal meaning of the phrase "in transitu;" but for the sake of convenience in defining the right of a creditor to stop goods which have been sold but not delivered to an insolvent purchaser, they have been given a broader technical signification. It may be doubted whether the phrase is ever used in our language in any other connection. It would seem therefore that if the parties to the contract in question had desired to employ a single phrase which would cover the carrier's exemption from liability from the time the goods were received by it until it had deliever them to the consignee, they would have used the more comprehensive terms. Had they done so, a more difficult ques-

tion would have been presented. But here the words "in transit"—the words actually used—according to their ordinary signification, apply only to the cotton from the time the transportation was to begin until the time it was to end under the contract. The cotton not having been set in motion towards its destination was not in fact in transit, and we cannot hold it constructively in transit while on the platform, without unwarrantably extending the meaning of a well defined word and doing violence to a well established canon of construction. Our interpretation of the word is strengthened by the fact that, in addition to exemption while in transit, the contract also provides that the company is not to be liable for loss of the cotton while in depot or place of trans-shipment or of landing at place of delivery. If the words "in transit" are to be given the broad construction contended for, then this additional provision is unnecessary. It is to be presumed that the express provision, that the company was not to be liable for loss while in depot or place of trans-shipment or of landing at place of delivery, was incorporated for a purpose, and the inference is strong that the purpose was to supply that which would have been wanting without it. In the absence of the well recognized rule of construction applicable to these contracts, we should be constrained to hold that the phrase "while in transit" did not exempt the company from the loss of the cotton before the transportation actually began: and in any event, there is such grave doubt as to the construction of the phrase as would require that the doubt should be resolved in favor of the shipper. The question has been passed upon in two cases, in both of which the ruling was in accordance with our view. Deming v. Compress Co., 90 Tenn., 310; Menzell v. Railway Co., 1 Dill., 531.

We come then to the question, was the cotton "in depot" within the meaning of the contract, when it was destroyed? The clause in which the words quoted are found admits of two constructions—one as if it read "or while in depot, or while in place of trans-shipment"—the other as if the words were "while in depot or trans-shipment or place of trans-shipment." If the former be the correct rendering of the clause, then the company would not have been liable for the loss of the cotton while at its depot at the initial point of the carriage; and we would have the question, whether the compress platform should be deemed a depot within the meaning of the contract. But we think the latter the better construction. The words "depot" and "place" stand in close connection, being separated only by the disjunctive conjunction; and by a strict grammatical construction occupy precisely the same relation to the other words of the clause. If it were intended to say depot or other place of trans-shipment, the words accurately expressed the idea and no others are necessary to be supplied. But if it were intended to mean any depot, then to express fully and accurately the meaning, we must insert the words "in" or "while in" before the word "place." In addition, the punctuation supports our construction of the language. If there had been a comma after the word "depot," it would have indicated that it was the purpose to detach that word from those next succeeding and to render

it independent of and unqualified by them. But the instrument, though in print, as appears from a fac-simile found in the transcript, and though carefully and correctly punctuated, has no comma at the place indicated. This we think tends to show that it was intended that the word depot should be qualified by the subsequent words in the clause, and that only depots of trans-shipment were meant. The Supreme Court of the United States say, that "punctuation is a most fallible standard by which to interpret a writing," but "it may be resorted to when all other means fail." Ewing v. Burnet, 11 Pet., 41. It would seem, that the clause in question was inserted with a view to meet the decision in Menzell v. Railway Company, supra, in which Judge Dillon held that the words "in transit" in a similar bill of lading did not exempt the carrier from liability for the goods while in its depot at a place of trans-shipment.

It may be true that no satisfactory answer can be given to the question why the defendant should limit its liability from the very moment the transportation began until the delivery of the cotton to the consignee, and it should omit to limit it at its receiving depot. It may be that its intention was to make its exemption general and to contract that it should not be liable for the loss of the property either while in transit or while at the place it was received or a place of trans-shipment or the place of delivery. But that is not the question. The inquiry is, did it so express that intention that the shipper, upon the inspection of the bill of lading, should have seen that it admitted of no other reasonable construction? As has been seen, we are of the opinion that the question must be answered in the negative and the maxim "fortius contra profer entem" must apply.

The case having been tried without a jury, the trial court found the facts, and his conclusions in that respect are not controverted. The value of the cotton was fixed by the agreement of the parties at the trial. Accordingly, the judgments of the District Court and of the Court of Civil Appeals are reversed, and judgment is here rendered for the plaintiff in error for the value of the property at the time of its destruction, with interest as a part of the damage

March 26, 1896.

*Reversed and rendered.*