### GARNER v. DAVIS.   (No. 1707.)

(Court of Civil Appeals of Texas. Amarillo. Nov. 24, 1920.)

1. **Brokers** &#9756;86(4)—**Evidence held not to sustain verdict finding broker procured customer.**

Testimony by the broker that he showed the land to the father, brother, and husband of the subsequent purchaser at a time when they stated they were not in the market for land, but that he did not show it to the purchaser, though he did show her city property, *held* not to sustain a verdict finding that he was the procuring cause of the sale, which was made through the purchaser's brother some time thereafter.

2. **Brokers** &#9756;60—**Entitled to commission on procuring purchaser though sale not consummated.**

Generally, a broker who has procured a purchaser ready, willing, and able to purchase the property on terms satisfactory to the owner, or upon the terms stated to the broker at the time of listing, is entitled to his compensation, though the sale is not consummated for some cause not attributable to the fault of the broker, unless there is a stipulation in the broker's contract of employment to the contrary.

3. **Brokers** &#9756;53—**Services not "efficient and procuring cause" unless sale results from broker's efforts.**

To make the broker the "efficient and procuring cause" of the sale so as to entitle him to his commission, it is essential that it result from his efforts, such as introducing the purchaser to the seller, advertising, giving the seller the name of the customer, or showng the purchaser over the premises.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Efficient Cause.]

4. **Brokers** &#9756;86(1)—**Evidence held not to show that purchase through another was to defraud broker.**

In an action for a broker's commission, evidence that the purchaser purchased the property through her brother, who had been shown over it by the broker, and that she paid for it with property previously obtained from her father, who had also been shown over the property by the broker, creates nothing more than a mere suspicion that the purchase was so made to defeat the right of the broker to his commission and is insufficient to sustain a verdict for the broker on that ground.

Appeal from District Court, Gray County; W. R. Ewing, Judge.

Action by G. C. Davis against C. D. Garner. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

W. T. Link, of Clarendon, for appellant.
Kimbrough, Underwood, Jackson & Simpson, of Amarillo, for appellee.

HALL, J. Appellee, Davis, a real estate broker, filed this suit against appellant to recover commissions alleged to be due him upon the sale of certain lands belonging to appellant. He alleges in substance that appellant authorized him to sell said lands at $15 per acre, obligating himself to pay plaintiff a commission of 5 per cent. on the sale or exchange price thereof, in the event he should find a purchaser to whom a sale or

exchange of the land could be effected; that he did procure Mrs. W. L. Holloway, as a purchaser, who entered into a binding contract and did become the purchaser thereof; that he was the efficient and procuring cause of the sale of said land to Mrs. Holloway. He sues in the alternative for the recovery of 5 per cent. commissions upon a quantum meruit. Appellant answered by general and special exceptions, general denial, specially alleged that the listing contract with plaintiff was canceled on, to wit, November 15, 1919; that the sale of his said lands to Mrs. Holloway was effected by another agent, viz., J. J. Taylor, with whom said land had been listed for sale, and to whom appellant had paid a commission. It is further alleged that the land was not in fact sold to Mrs. Holloway for money, but was exchanged for oil stock, and that the land in question was never at any time listed with plaintiff for exchange, or to be traded for oil stock.

By a first supplemental petition, plaintiff pleaded in substance that, if appellant paid any commission to J. J. Taylor for the sale of the land in question, then that the said J. J. Taylor was the brother of Mrs. Holloway, the purchaser of the land, and that any moneys paid to him, the said Taylor, were paid in an effort and for the purpose of defeating plaintiff in his right to the commission; that the said Taylor and defendant fraudulently confederated and conspired together to pretend that the said Taylor caused the sale to be made and that if any money had been paid such money was fraudulent and simulated and made for the sole and only purpose of defeating the appellee's claim for the payment of a commission; that the defendant knew at the time he made the pretended payment to the said Taylor that appellee was expecting and would demand the payment of the commission to him in the amount he sued for, and that the defendant advised with the appellant about the payment of the plaintiff's commission, and that the plaintiff informed the defendant that he would expect and demand his commission, and that if defendant paid anything to the said Taylor it was paid with the full knowledge of all the facts concerning the plaintiff's claim and right to the commission; that C. T. Taylor was and is the father of the purchaser, Mrs. W. L. Holloway; that the money with which to purchase the land was being furnished to Mrs. Holloway, the purchaser, by her father, C. T. Taylor; that it was the purpose of C. T. Taylor to purchase land for Mrs. Holloway and his other children in Gray county, Tex.; that the children were desirous of buying land adjoining or situated near lands bought by the others; that the said C. T. and J. J. Taylor and Mrs. Holloway, the purchaser of the land, for the commission on the sale of which the plaintiff sued, conferred and advised with each other with reference to the lands proposed to be bought by themselves, or by their father, C. T. Taylor, for the use of his children; that both C. T. Taylor and J. J. Taylor were acting for and assisting Mrs. Holloway and her husband, W. L. Holloway, in selecting and making a purchase of her land, and did assist and advise with her in the purchase of the tract of land from the appellant, C. D. Garner; that Mrs. Holloway, the purchaser, advised with her father, C. T. Taylor, and her brother, J. J. Taylor, in the purchase of the land, as well as with her husband; that if defendant's land was not in fact sold for cash it was sold for property; that the property was accepted in lieu of money by defendant, at its actual cash value; and that if any oil stock was accepted in part payment for the land by defendant, it was taken and accepted at its fair market value and treated as a cash payment by the parties and so designated as a cash payment, and the sale or exchange was so made to the purchaser, Mrs. Holloway, who was procured by the plaintiff, and the sale was concluded with the full knowledge of plaintiff's efforts and agency and on terms and conditions satisfactory to the defendant Garner, so that he was liable for the full amount of the commission.

The case was submitted to the jury upon special issues, in answer to which the jury found in substance that appellee was the efficient cause of the sale to Mrs. Holloway; that appellant had agreed to pay him 5 per cent. commissions; and that the listing contract was not terminated on the 15th day of November, 1919. In accordance with the verdict, judgment was rendered for appellee for the full amount claimed.

Appellant requested the court to direct a verdict in his favor. The refusal of the court to give this charge is made the basis of the first assignment of error. We think this charge should have been given. The evidence is wholly insufficient to sustain appellee's allegation that he was the efficient cause of the sale to Mrs. Holloway, or that she was procured through his efforts. It appears from the statement of facts that appellee had formerly lived in Clay county, where he had known C. T. Taylor, the father of Mrs. Holloway, and J. J. Taylor, one of her brothers. Subsequently he moved to Clarendon, and may have been, to some extent, instrumental in inducing the elder Taylor to invest, in Panhandle lands, money which the said Taylor had realized from certain oil interests owned by him in Clay county. The evidence is uncontradicted that C. T. Taylor expressed the intention of buying some land in the Panhandle country and dividing it amongst his children; that he did subsequently purchase land through appellee, in Donley county, a part of which was given to Mrs. Holloway. Later, it seems, the chil-

dren of C. T. Taylor decided the land so purchased could not be conveniently divided so Mrs. Holloway sold her interest in it to her brother H. H. Taylor. There is no evidence in the record that C. T. Taylor was directly or indirectly interested in the purchase of appellant's land. Appellee testified in substance as follows:

"J. J. Taylor is the son of C. T. Taylor and the brother of Mrs. Holloway. I had some conversation with the Taylors with reference to the sale of lands in this (Donley) county, before they moved up here, that is with the old gentleman, and J. J. Mr. Garner had listed his land (in Gray county) with me for sale. After Garner bought this land, I took it right back on the market at $15 an acre. The amount of commission I was to be paid, if I should find a purchaser for this land, after it was listed with me, was 5 per cent. Subsequent to that time and up until I showed the land early last fall, I had several further conversations with Garner about the sale of the land up there, and Garner knew of my showing the land, because he would be at home sometimes. I discussed a number of times with him the matter of sale or probable sale. Every time he came to town he made my office his headquarters and stayed all night with me a heap, and that was his general topic. As to about how many different parties I think I carried out to look at the land prior to the time the negotiations with the Taylors began, I would say two or three different persons, and I discussed the matter with others, with the knowledge of Mr. Garner. No, I never did show this land to Mrs. Holloway herself, but I did show it to her brother and her father, and her husband, some time in the summer. We started from Clarendon about the middle of the summer, Mr. Holloway, Jim Taylor, C. T. Taylor, and myself, in my car, and came to Alanreed, and on over to look at Mr. Garner's land. Drove over every section of it in the car. Shortly after this trip I knew C. T. Taylor purchased some land in Donley county, Tex., being 6,400 acres, a portion of which was given to Mrs. Holloway, and other portions to another sister and the boys.

"The purchase of the Donley county land and the transfer of a part of it to Mrs. Holloway occurred after this trip to Gray county. As to the character of inspection we made of the Gray county land, we just drove around in the car, going up on every point; stopped and looked over the domain from the best points; showed them the fence lines; drove over it thoroughly. We made a careful investigation of it and they said they were satisfied. Our purpose in going to the place that day was to sell it to Uncle Charley for the children or some of the bunch. The price I made them on the land was $15 an acre, which was the price I had it listed at. I had further conversations with Mr. Holloway at Clarendon, with reference to this land up until they bought that other tract of land; would see them on the street and speak to them about it. As to the efforts I made to interest them in the Garner land, I showed them the land, and he expressed his likes to the tract of land, liked it and thought it worth the money, and the efforts I made after returning to Clar-

endon to interest them in the land was to just speak to them casually, and he never did express a bit of disapproval of the land. As to how came all these parties to go to look at the land on this occasion with me from Clarendon, the time Mr. Holloway, J. J. Taylor, and C. T. Taylor went, it was this way: I had put this land up to them in Wichita Falls. Mr. Jim Taylor said he was going to move out to Whitedeer right away; that he had five sections north of Whitedeer and just as soon as he got his family settled he was ready to look with me to buy some of it, so when he got to Whitedeer and unloaded he found the man who had his place listed had sold and the fellow that bought it was going to take possession, and Mr. Taylor then called me up and made an appointment. I met him at Groom and brought him over to the Jim Williams place, and I showed him this Garner land, and he thought it would suit his father, so he 'phoned his father, C. T. Taylor, to come up to Clarendon and I would bring him across. I guess it was a week or ten days probably after he told me this until Mr. Taylor and his father came up on a car and that Mr. Jim Taylor met them, and the next day I brought him and C. T. Taylor and Mr. Holloway over to see the land. Mr. C. T. Taylor said he didn't want any land himself; just wanted it for the children; wanted a piece of land that could be cut up. Mrs. Holloway was one of the children he was buying for. C. T. Taylor said he would like to get something he could cut up, that could easily be divided, for the children. I don't know as he expressed himself one way or the other in regard to this Garner land, but it seemed he was favorably impressed with it. Mr. Holloway stated several times when we were on the land that it was worth the money; that he thought it a good piece of land.

"In my office at Clarendon, subsequent to the time that I showed the land to Mr. Holloway, and before the lease contract between Garner and Mrs. Holloway was signed up, on the 24th of December, I had some conversation with Mr. Garner about the negotiations between him and Mr. and Mrs. Holloway. To the best of my recollection it was about three weeks before that contract was signed. He came into my office and said: 'I am about to sell this land to Mrs. Holloway. What about it? I have got to pay Jim Taylor a commission to make the deal. What about you?' And I says, 'I just expect my commission if you sell it to any of that bunch.' At that time he said he had to pay Jim Taylor a commission to get him to pull the deal, and I told him if he made any such sale that I would expect my commission, and he says to me, 'Well, they want me to take in some oil stock for a part of the consideration,' and he said that I was not entitled to anything—said, 'They say you are not.' He never did say he didn't owe me any commission; he would always say, 'They say I don't owe you any.' I told him at that time that they were my customers and that I was entitled to the commission, and I told him that I expected a commission; that I had brought the men to this country, put them over the land, and was entitled to a commission. When we started on that trip, Holloway said he didn't have any money; no, he didn't say he was not in the market for

land, but said he didn't have any money. I listed Mr. Garner's land like hundreds of other tracts, with the understanding that probably 20 or 30 real estate agents would have the land listed and that the one most successful would get the commission for selling it, that is, the one who finds a buyer is the one who gets the commission. If C. T. Taylor had objected to the purchase of this land by Mrs. Holloway, she would not have bought it. He never did say anything about it. I never did bring her over here. I made no effort whatever to get Mrs. Holloway interested in this land and did not say anything about the land to her. Along in August, I showed Mr. and Mrs. Holloway a lot of city property—probably the next day after the trip we made over here. At that time I didn't mention to her any Garner land. I didn't understand she would have to be consulted about any land bought. The old man said he wanted the land for his children.

"Q. Now then, Mr. Davis, counsel asked you about after Mrs. Holloway and Mr. Holloway got in the market again, had sold the Donley county land, why you didn't go back and put this land up to them again. Just tell the jury why you didn't go back to them again along in November or December. A. Well, I had showed them what I thought would suit them, and there were so many men after them I didn't bother them. If they wanted what I showed them, I thought they would come to me and say so, and I didn't bother them, because it is a nuisance to be talked to death. I had shown them the good qualities and told them all about the land that I knew. You could have seen a calf anywhere on that tract, for I drove over it until they said they had seen it sufficient."

### W. L. Holloway testified:

"I am the husband of Mrs. W. L. Holloway. During the month of August, 1919, in company with J. J. Taylor and C. T. Taylor, I went with Mr. Davis over to Gray county. I went just for the trip. I was not in the market for land, and I told G. C. Davis I was not; that there was no use in taking the trip and burning his gasoline. I think that at the time we went over to Gray county C. T. Taylor had purchased land in Donley county, or at least contracted for land. Mr. C. T. Taylor gave some of the land in Donley county to each of his four children, including my wife, Mrs. W. L. Holloway. She owned the Donley county land about 30 days and sold it about the first of October to her brother H. H. Taylor. During the time Mrs. Holloway owned the Donley county land, we were not in the market for any other land, and Mrs. Holloway and myself were not in the market for any land at the time of the Gray county trip. It was two months after this Gray county trip before we became desirous of purchasing land."

### Mrs. W. L. Holloway testified:

"The sale of this land was first mentioned to me by J. J. Taylor. Mr. Davis never at any time mentioned the sale of this land to me. I don't remember the exact date I first learned of this land being for sale, but it was some time late in November or early part of December. I looked over the land before purchasing the same, J. J. Taylor being the one

who showed it to me. Mr. Davis was not present at any time while I was looking over the land, and plaintiff, Davis, never at any time so much as told me of this land or that the land was listed with him for sale. J. J. Taylor told me about it."

### Appellant, Garner, testified:

"When this land was sold or traded, I paid a commission to J. J. Taylor. Mr. Taylor and I did not have any agreement, at the time I listed the land with him, with reference to defrauding Mr. Davis, and Mr. Taylor and I had no agreement at the time Mrs. Holloway bought the land with reference to our defrauding Davis out of the commission. I paid Taylor the commission in good faith, for I sold the land and I thought he was entitled to it. I know he brought the woman and showed her the land."

It was shown that J. J. Taylor had been, to some extent, a real estate broker, and that some sort of an agreement existed between him and appellee with reference to an equal division of commissions earned upon the sale by either of lands listed with the other.

[1] If we accept the testimony of appellee alone, it fails to sustain his right to recover. His answer to the question propounded to him and quoted above shows that he had practically abandoned all effort to sell the property to any member of the Taylor family. It is true that he carried the father, brother, and husband of Mrs. Holloway to Gray county and showed them the land about five months before Mrs. Holloway purchased it, and according to his testimony he mentioned it to some of them several times afterwards; but it matters not how diligent and zealous he may have been, nor how earnest he was in his efforts to effect a sale; the fact that he was unsuccessful in accomplishing the object of his employment will defeat his claim for compensation.

[2, 3] The courts have predicated the right of a real estate broker to recover compensation upon a number of different grounds. It is generally held that where the broker has procured a proposed purchaser, who is ready, willing, and able to purchase the property, upon terms satisfactory to the owner, or upon the terms stated by the owner to the broker at the time of listing, he is entitled to his compensation, even though the sale is not consummated, because of a defect in the title, or some misrepresentation made by the owner in regard to the premises or other cause not attributable to the fault of the broker. Unless there is a stipulation in the contract of employment to the contrary, the general rule is that the broker is neither required to consummate the deal nor procure a purchaser who will enter into a binding contract. To constitute the broker the efficient and procuring cause of the transaction it is essential that the sale or exchange is the result of his efforts, such as introducing the purchaser to the seller, by advertising,

by giving the principal the name of his customer as a possible purchaser, or showing the purchaser over the premises.

[4] It cannot reasonably be contended, in this case, that Mrs. Holloway, as a purchaser, was procured by appellee, and the only theory upon which the jury could have found that he was the procuring cause of the sale is that of fraud alleged by him in his supplemental petition. This allegation was denied by Garner and by J. J. Taylor, and there is no positive proof in the record tending to sustain it. Appellee testified that C. T. Taylor, the father, had said he intended to purchase land in the Panhandle and divide it amongst his children; but this had been done through appellee, and Mrs. Holloway had received her share of the Muir ranch in Donley county, which the record shows was purchased by the father for that purpose. Later, in the month of October, she sold her interest in this property, and it is uncontroverted that the land in question was purchased by her individually and with her own funds, or rather by exchanging oil stock which she owned, for it. Appellee frankly admits that, although he showed her some city property on the day after he had shown the Garner land to her father, brother, and husband, he never mentioned this property to her, either then or at any other time. Mrs. Holloway testified, without contradiction, that J. J. Taylor first mentioned this land to her, and it appears that she went with him to inspect it. The fact that J. J. Taylor is her brother and that she paid for the land with property previously obtained from her father may be sufficient to suggest that she purchased it through her brother with the intent and under an agreement with Garner and her brother to defeat appellee's claim for compensation; but such evidence, at best, creates nothing more than a mere suspicion of fraud. This is not sufficient upon which to base a verdict. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1062.

We deem it unnecessary to consider the remaining assignments.

Because the evidence is wholly insufficient to support the verdict, the judgment is reversed and is here rendered for appellant.