*Jim S. SALE, Appellant,*

v.

**CONTRAN CORPORATION, Appellee.**

**No. 17925.**

Court of Civil Appeals of Texas, Dallas.

Sept. 28, 1972.

Rehearing Denied Oct. 26, 1972.

Roy C. Coffee, Jr., Coffee, Coffee & Chantilies, Dallas, for appellant.

D. Marshall Simmons, H. Robert Powell, Jenkens, Spradley & Gilchrist, Dallas, for appellee.

GUITTARD, Justice.

Jim Sale, a securities broker, sued Contran Corporation for a fee of $130,000 on an acquisition of stock which was never completed. The trial court rendered summary judgment denying recovery, and the broker appeals. We affirm on the ground that the broker's contract made the fee contingent on a "purchase," which never occurred.

The contract is evidenced by a letter dated April 16, 1969, from plaintiff Jim Sale to Harold Simmons, president of defendant Contran Corporation, as follows:

"Please call me and let me know when you will be able to go with me to Lafayette, Louisiana to explore the possibility of purchasing the Brown Thrift City drug chain and wholesale operations.

"Should these negotiations lead to a purchase by you or your corporations of this chain, my fee will be four (4%) per cent of the first million dollars and one (1%) per cent of any figure above one million dollars, payable in cash upon closing of the deal."

Depositions in the record show that Sale and Simmons made the trip contemplated in this letter. They spent one day visiting with Brown and Castile, the principal shareholders of the Brown drug chain, and looking at some of their stores. Simmons then told Sale he had already done his part, and went ahead with the negotiations without him. On May 15 Contran and the Brown shareholders signed a "letter of intent" evidencing a tentative agreement for Contran to purchase the assets of the Brown drug chain in exchange for shares of Contran's stock to be authorized at a meeting of its shareholders. On May 20 Simmons wrote Sale proposing that Sale's commission also be paid in Contran's stock valued on the same basis as in the trade with the owners of the Brown drug chain. Simmons promised, "We will issue your stock at the same time we issue their stock." Sale accepted this proposal in a letter dated May 21. On July 9 Contran and the shareholders of the Brown drug chain signed an elaborate "agreement of reorganization" by which the Brown shareholders agreed, upon specified conditions, to transfer all their stock to Contran in exchange for 1,216,667 shares of Contran's stock, plus additional shares one year after the initial exchange. For reasons to be noted later, that agreement was cancelled by mutual releases and Contran's stockholders never authorized issuance of any stock to be exchanged for the Brown stock.

Plaintiff contends that the fee is due under authorities holding that a broker is entitled to compensation if he produces a prospect able and willing to trade on terms specified by the principal or if the principal and the prospect actually agree on the terms of a trade, even though the transaction is never completed for some cause not attributable to the broker.[1] Those authori-

---

1. Kost v. Lancaster, 414 S.W.2d 514 (Tex.Civ.App., Houston 1967, writ ref'd n. r. e.); Anderson-Berney Bldg. Co. v. Swan, 133 S.W.2d 269 (Tex.Civ.App., Fort Worth 1939, writ dism'd jdgmt cor.); Garner v. Davis, 225 S.W. 567 (Tex.Civ.App., Amarillo 1920, no writ); Cheek v. Nicholson, 133 S.W. 707 (Tex. Civ.App., Galveston 1911, no writ).

ties do not control here because plaintiff's fee was expressly contingent on "purchase" of the Brown drug chain, and, as we interpret the contract, this contingency never occurred.

The contract must be interpreted with reference to the nature of the transaction then in contemplation. Plaintiff was engaged in the occupation of trying to put sellers and purchasers of businesses together. Acquisition of a business such as the Brown drug chain is far more complex than an ordinary real estate transaction. As exemplified by the facts shown in this record, an acquisition proceeds through various stages, including initial contact, preliminary negotiations, a letter of intent stating the basic terms of the proposed acquisition, further negotiations concerning details; preparation and signing of a comprehensive acquisition agreement specifying various conditions to the obligations of both parties; efforts to satisfy these conditions by opinions of lawyers and accountants, shareholders' meetings, amendments to articles of incorporation, and rulings from agencies such as Internal Revenue Service and Securities Exchange Commission; and finally, a "closing" at which the necessary documents are signed and delivered and titles to property or securities transferred.[2] In this process the broker is employed only to make the initial contact. Completion of his service in that respect does not in itself entitle him to compensation. His fee is contingent on the success of negotiations and other activities in which he has little part. Presumably, he offsets the uncertainty of his compensation by fixing it at an amount somewhat larger than his client would be willing to pay without a successful result.

■ Our problem is to identify the contingency upon which plaintiff's compensation depended. The controlling contractual language is: "Should these negotiations lead to a purchase * * * my fee will be * * * payable in cash upon closing of the deal." This language specifies "purchase" as the controlling contingency, and we must determine the meaning of that term. In the context shown by the undisputed evidence, we conclude that "purchase" means that the process of acquisition be completed, not aborted at some intermediate stage. Neither the "letter of intent" nor the "agreement of reorganization" was a successful completion of the acquisition process. Success could be established only by transfer of ownership of the properties to be acquired,[3] or, at least, by a binding contract which Contran could enforce.

Plaintiff argues that the "agreement of reorganization" was a "purchase" because it was a valid and binding contract for acquisition of the Brown drug chain. We cannot agree. That agreement, though comprehensive in its terms and obviously drafted with great care, was not a definitive resolution of the acquisition process. Many matters to be done and determined before closing were detailed in the various conditions of the obligations of each of the parties. One of the specified conditions of Contran's obligations was an amendment to its articles of incorporation authorizing issuance of stock to be transferred in the proposed exchange. By this express provision the parties recognized that Contran could not bind itself to issue its shares without a vote of its shareholders at a meeting properly called and conducted. Since no such authorization was ever obtained, neither Contran nor the Brown shareholders were bound.

Also, at least two of the specified conditions of the obligations of the Brown

---

2. This process is lucidly described in Gilchrist, *Documentation of a Corporate Acquisition*, 25 Sw.L.J. 299 (1971). The author likens such an acquisition to the various stages involved in a marriage, including courtship, engagement, preparation and wedding.

3. Applying Mr. Gilchrist's metaphor cited in note 2 *supra*, the contingency was the marriage rather than the engagement of the corporate parties.

shareholders were not satisfied. One was that Contran would cause its subsidiary, Ward's Cut-Rate Drug Company, to obtain $10,000,000 by sale of securities and apply that amount on Ward's short term indebtedness. Because of a market decline, the underwriters who had previously indicated willingness to take Ward's securities declined to do so. Another express condition was that no material adverse change take place in the financial conditions or operations of Contran or its subsidiaries from that submitted to the Brown shareholders. Such a change did occur, in that a subsequent audit showed that Mading-Dugan, another subsidiary of Contran, had experienced a loss of $500,000 in the previous fiscal year, rather than the $500,000 profit shown on the interim financial statement furnished to the Brown shareholders. Since these express conditions were not satisfied, the case falls within the rule that the signing of a sale contract subject to a condition does not in itself entitle the broker to compensation unless the condition is met.[4]

Plaintiff does not contend that these conditions or any of the other various conditions specified in the "agreement of reorganization" were satisfied so that the agreement became enforceable by or against Contran. Consequently, we need not consider whether under those circumstances the transaction would have amounted to a "purchase" without a final "closing of the deal." The circumstances established by the summary-judgment proof compel the conclusion that although a form of contract was signed, the negotiations initiated by plaintiff were not ultimately successful because Contran could never meet the conditions demanded by the Brown shareholders for sale of their stock. Therefore, no "purchase" of the Brown drug chain, as contemplated in the broker's agreement, ever took place, and no compensation is due.

■ Plaintiff also cites authorities holding that a broker cannot be deprived of his fee by refusal of the principal to complete a transaction that the other party is able and willing to complete[5] or by voluntary rescission.[6] Neither willingness of the other party nor voluntary rescission is raised by the undisputed evidence here. Simmons testified that after the acquisition agreement was signed the price of Contran's stock declined so much that the Brown shareholders refused to complete the trade and threatened legal action unless released from the contract. At first Simmons told the Brown shareholders that Contran would sue to enforce the agreement, but Contran decided not to sue on advice of counsel that it could not be enforced because of Contran's inability to satisfy the conditions above mentioned.[7]

---

4. Roquemore v. Talley, 451 S.W.2d 319 (Tex.Civ.App., Dallas 1970, writ ref'd n. r. e.) ; Warren v. Russell, 206 S.W. 2d 132 (Tex.Civ.App., Austin 1947, no writ).

5. West Realty & Investment Co. v. Hite, 283 S.W. 481 (Tex.Comm'n App.1926) ; Kirkland & Son v. Berry, 136 S.W. 832 (Tex.Civ.App., Texarkana 1911, no writ) ; Restatement, Agency, 2d, § 445, comment e (1958).

6. Henry v. Schweitzer, 435 S.W.2d 941 (Tex.Civ.App., San Antonio 1968, writ ref'd n. r. e.) ; Miller v. Carlson, 390 S.W.2d 64 (Tex.Civ.App., Texarkana 1965, no writ) ; Stocking v. Huth, 141 S.W. 570 (Tex.Civ.App., San Antonio 1911, no writ).

7. Plaintiff did not allege or prove and does not now contend that Contran's inability to satisfy the conditions specified by the Brown shareholders was Contran's "fault," within the rule that even when the broker's compensation is contingent on closing, he is entitled to recover if the transaction is not closed because of the "fault" of the principal. See Peters v. Coleman, 263 S.W.2d 639 (Tex.Civ.App., Fort Worth 1953, writ ref'd n. r. e.) ; Heath v. Huffhines, 152 S.W. 176 (Tex.Civ.App., Fort Worth 1912, no writ). Consequently, we need not decide whether in a case such as this, where the broker is employed only to provide an initial contact and negotiations are carried on directly by the principal, the principal has a contractual duty to the broker to complete the trans-

This testimony is corroborated by an affidavit of Herbert Brown, stating that the Brown shareholders had many conditions they wished satisfied before they would sell their stock, that these conditions were merged into the "agreement of reorganization," and because they were not met the Brown shareholders refused to go forward with it. Consequently, the summary-judgment proof establishes that Contran did not refuse to go forward with a transaction satisfactory to the other party, but rather that the unwillingness was on the other side. The proof also establishes that since the mutual release was executed under threat of litigation, it cannot be considered a voluntary rescission by Contran or as establishing the enforceability of the agreement as against the Brown shareholders.[8]

Plaintiff contends further that the summary judgment is improper because the contract was ambiguous and its interpretation was a fact issue. However, no ambiguity was pleaded, and in the absence of allegations specifying the language subject to different interpretations so that the opposing party may be prepared to meet evidence offered to explain the meaning, construction of a contract is a matter of law for the court, even though the meaning may be doubtful.[9] Moreover, interpretation of a contract becomes a fact issue to be resolved by extrinsic evidence only when application of pertinent rules of construction leave a genuine uncertainty as to which of two meanings is proper.[10] One of these rules is that words of doubtful meaning must be construed strictly against the party who selected the language.[11] This rule provides further support for our holding, since the language we have construed most strictly against plaintiff was selected by him in drafting his own letter evidencing the contract sued on.

Affirmed.

action after a binding contract is made with the prospect introduced by the broker. Neither do we decide whether the principal's inability to complete the transaction under such circumstances amounts to a breach of such a duty, for which the broker may recover damages in an amount equal to the compensation promised him on completion.

8. Toland v. Kaliff, 435 S.W.2d 260 (Tex. Civ.App., San Antonio 1968, no writ).

9. Wynnewood State Bank v. Embrey, 451 S.W.2d 930 (Tex.Civ.App., Dallas 1970, writ ref'd n. r. e.); Ross v. Burleson, 274 S.W.2d 105 (Tex.Civ.App., San Antonio 1954, no writ).

10. Universal C.I.T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154 (1951); Lewis v. East Texas Finance Co., 136 Tex. 149, 146 S.W.2d 977 (1941).

11. Amory Manufacturing Co. v. Gulf, C. & S. F. Ry. Co., 89 Tex. 419, 37 S.W. 856 (1896); Ervay, Inc. v. Wood, 373 S.W.2d 380 (Tex.Civ.App., Dallas 1963, writ ref'd n. r. e.).