Hardy GAGE, Appellant,

v.

G. E. LANGFORD et al., Appellees.

No. 5193.

Court of Civil Appeals of Texas, Eastland.

May 10, 1979.

Rehearing Denied June 7, 1979.

Randy J. Hall, Fillmore & Camp, Fort Worth, for appellant.

Frank Jennings, Jennings, Montgomery, Dies & Turner, Graham, W. G. Thompson, Harrell, Thompson & Cook, Breckenridge, for appellees.

McCLOUD, Chief Justice.

Plaintiffs, G. E. Langford, F. L. Livingston, and Bill Briscoe, sued defendant, Hardy Gage, for the unpaid balance on a promissory note, signed by Gage, in the original principal sum of $550,000. Gage answered seeking cancellation of the note because of fraud and failure of consideration. He alternatively sought offsets and filed a cross action for damages resulting from the alleged fraud. Following a jury trial, the court rendered judgment for plaintiffs for $229,922.18 (which represented the unpaid balance found by the court minus a credit of $89,250 found by the jury) plus accrued interest of $77,774.55, and attorney's fees of $76,924.18. Gage has appealed. We reverse and remand.

The $550,000 note, dated April 1, 1974, was made payable within ninety days to G. E. Langford, but was owned by all three plaintiffs. The note was executed in connection with a written "Contract of Sale" dated April 1, 1974, between Gage and G. E. Langford, by his "Agent and Attorney-in-Fact," F. L. Livingston. All plaintiffs concede they are bound by the contract.

The "Langford-Gage" agreement which designated G. E. Langford, seller, and Hardy Gage, buyer, provides in part:

Buyer agrees to pay seller Five Hundred Fifty Thousand Dollars ($550,000.00) due ninety (90) days from date hereof at interest of 9 percentum per annum. Seller agrees to assign to buyer the following oil, gas and mineral leases, the location of each being well known to the parties hereto, to-wit:

(A) *Archer County Leases*:
1. O. C. Sherley Lease
2. Campbell "AA" and "BB" Leases
3. Wright Campbell Lease
(B) *Jack County Leases*:
1. Shown Lease
2. D. R. Sewell Lease

·    ·    ·    ·    ·

Buyer shall bear all expenses of operations carried on or incurred in connection with the five (5) leases in Archer and Jack Counties, being the first 5 leases hereinabove mentioned, from and after the date of this contract; provided, however, that in addition thereto, all expenses incurred by seller on these 5 leases shall be reimbursed by seller to buyer (*sic*) [buyer to seller], such expenses being incurred in connection with services and expenses incurred in connection with plugging and pulling rods, tubing and casing from said leases.

Seller shall allow buyer credit for the gross sale price of all pipe sold under seller's pipe contract with R. G. & R. M., Inc., et al., dated March 25, 1974, provided, however, that buyer is to reimburse seller for all expenses of seller in connection with such sales. Accordingly, any "net profit" on such sales of seller of said

pipe shall apply to a reduction of the $550,000.00 note herein first above mentioned.

Seller shall assign or cause to be assigned to buyer the five (5) leases first above described upon payment of the total amount due to seller on the $550,-000.00 note after allowing buyer all credits to which he is entitled under this contract to be applied against said note. Accordingly, title to the oil, gas and mineral leasehold estate and personal equipment situated upon the 5 leases first above described shall not vest in buyer until seller has been fully paid therefor in accordance with this contract and the assignments provided for herein are delivered to buyer in accordance herewith.

The contract further provides for the sale of additional pipe which we find unnecessary to discuss.

The "R.G. & R.M., Inc., et al" contract referred to in the Langford-Gage agreement is a contract between G. E. Langford, as seller, and R.G. & R.M., Inc., and R. E. McElmurry and R. L. Gray, as buyer, which states that "seller" agrees to sell and "buyer" agrees to buy for a period of ninety days, at a stipulated price, "all the . . casing . . . recoverable from abandoned wells which are being or are to be plugged off" the five leases in question.

Gage plugged and salvaged every well he was able to locate on the five leases. When the Langford-Gage agreement was entered into, only the Shown and Sewell leases were producing oil. Gage plugged the wells and salvaged the equipment located on those leases. At the time the agreement was entered into by the parties, there was a great demand for used pipe and the price was high. Within a few months after the agreement was signed, the price of used pipe dropped by about 50 percent, and the cost of pulling and plugging wells increased.

At the time of trial, plaintiffs tendered to Gage assignments of the leases in question. The leases were not "valid and subsisting." They had all terminated because of lack of production. The parties stipulated that the jury would find "that the plugging of all of the wells on the leases involved in the Langford-Gage agreement prevented the plaintiffs from assigning leases to the defendant that were still in force and effect." The jury found in Special Issue No. 5H that plaintiffs and defendant intended "that under the Langford-Gage agreement the defendant would receive an assignment only of leases that were salvaged out and had terminated."

Gage contends that the Langford-Gage agreement is unambiguous on its face and, therefore, the intent of the parties is a question of law. He argues that upon application of the pertinent rules of construction, one meaning with regard to intent clearly emerges: Gage was to have received assignments of "valid and subsisting" oil and gas leases identified in the Langford-Gage agreement. We disagree.

We hold that the contract is ambiguous on its face and, therefore, the trial court did not err in submitting the question of the parties' intent to the jury. After application of all pertinent rules of construction, the contract remains susceptible to more than one reasonable meaning. *Trinity Universal Insurance Company v. Ponsford Brothers*, 423 S.W.2d 571 (Tex. 1968); *Universal C. I. T. Credit Corporation v. Daniel*, 150 Tex. 513, 243 S.W.2d 154 (1951).

Gage points to the provisions in the contract unequivocally providing for the assignment of specified oil and gas leases as giving rise to the interpretation that the parties intended that Langford would assign to Gage existing and valid leases when Gage paid the note. Other portions, however, indicate that the purpose of the contract was to sell the pipe to be salvaged from the specified leases.

For instance, one paragraph provides that Gage is to reimburse Langford for expenses incurred by Langford in connection with pulling pipe and plugging wells on the leases. Another paragraph makes specific references to an extrinsic contract which is clearly a contract for the sale of salvaged

pipe from the leases specified in the Langford-Gage contract.

Thus, another reasonable interpretation derived from the face of the instrument is that the parties intended that the wells on the specified leases would be salvaged for pipe and plugged, and that the leases to be assigned would necessarily be terminated.

An interpretation that the parties intended to assign terminated leases is reasonable, assuming that the purpose of the contract was to sell salvaged pipe. The assignments to be made after Gage paid the note would evidence his right of ownership to the pipe salvaged.

■ The contract was drafted by Langford's attorney. We have applied the rule of strict construction against the drafter, together with other pertinent rules of construction, and find that the contract remains susceptible to more than one reasonable meaning on its face, and is therefore ambiguous. *See Sale v. Contran Corporation*, 486 S.W.2d 161 (Tex.Civ.App.—Dallas 1972, writ ref'd n. r. e.); *Ervay, Inc. v. Wood*, 373 S.W.2d 380 (Tex.Civ.App.—Dallas 1963, writ ref'd n. r. e.).

We hold that the court properly submitted Special Issue No. 5H inquiring as to the intent of the parties. There is evidence to support the jury's finding to such issue, and the evidence is not factually insufficient. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

■ The jury's finding to Special Issue No. 5H established that there was no fraud, failure of consideration, or breach of contract in connection with the agreement to assign the five leases. The finding rendered immaterial other findings by the jury concerning representations by Livingston and reliance by Gage regarding the leases to be assigned. Since the issues were immaterial, the court properly disregarded the findings even though plaintiffs failed to comply with the procedure of Tex.R.Civ.P. 301. 4 McDonald, Texas Civil Practice § 17.31 (1971).

■ In a series of special issues, the jury found that F. L. Livingston fraudulently represented to Gage that there was a total of "271 salvage wells" located on the five leases under discussion. The jury further found that had the representation been true, Gage would in reasonable probability have recovered $99,568.69 in additional casing. However, based upon the definitions given by the court, the jury found that Gage "ratified" the Langford-Gage agreement by continuing to plug wells and salvage pipe after learning that he had acquired less than 271 wells to be pulled and plugged.

Gage seeks rescission of the contract and argues there is no evidence to support the ratification finding. Gage also argues the ratification definition was erroneous because it failed to include the requirement that the person ratifying an agreement must have full knowledge of all facts involved. We think the ratification finding is immaterial because under the facts of this case Gage has neither restored nor properly offered to restore the parties to their original status. A party seeking cancellation must restore, or offer to restore, the other party to the condition he occupied before the transaction. *Texas Company v. State*, 154 Tex. 494, 281 S.W.2d 83 (1955); 2 Pomeroy, Equitable Remedies § 2110 (2d ed. 1919); 10 Tex.Jur.2d, Cancellation of Instruments § 45 (1959); 13 Am.Jur.2d, Cancellation of Instruments § 39 (1964); 12 C.J.S. Cancellation of Instruments § 44 (1938). Gage has plugged and pulled every well he found on the five leases. The pipe has been sold. When the Langford-Gage agreement was entered into, the demand for used pipe and equipment was strong. The market value was high. Gage became the beneficiary, for 90 days of a favorable built-in market for the pipe under the R.G. & R.M. contract. Much of the pipe was sold by Gage after the R.G. & R.M. contract terminated, and after a substantial drop in the used pipe market and a significant increase in the cost of pulling the pipe. Gage offered to restore to plaintiffs what he received from the sale of the salvaged pipe and equipment, less his expenses in salvaging and plugging the wells. We hold that

Gage's offer fails to place the plaintiffs in the position they occupied before the transaction. Gage has failed to show that he is entitled to cancellation of the contract. *De-Puy v. Bodine*, 509 S.W.2d 698 (Tex.Civ. App.—San Antonio 1974, writ ref'd n. r. e.).

The jury also found that by conduct inconsistent with an intention to sue for damages, Gage "waived" the right to sue as a result of acquiring less than 271 wells to be pulled and plugged. Gage argues there is no evidence to support the jury's finding. We disagree. There is evidence to support the issue and accompanying definition as given. · Furthermore, the evidence is not factually insufficient to support the finding. *In re King's Estate*, supra. We hold, however, the case must be reversed and remanded for a new trial because of the erroneous definition of "Waiver" given by the court. The jury was instructed that waiver "means the giving up, relinquishment, or surrender of some known right, and takes place where a man dispenses with the performance of something which he has a right to exact." Gage properly objected to the definition given by the court and specifically pointed out that for waiver to occur a person must "intentionally" give up, relinquish or surrender some known right.

In *Futrell v. Martin*, 40 S.W.2d 946 (Tex. Civ.App.—Texarkana 1931, no writ), the trial court instructed the jury that the word "waiver" meant to relinquish a known right. The appellate court reversed and remanded the cause because the word "intentional" was not included in the definition. The court stated:

> "Waiver" seems to be universally defined as "intentional relinquishment of a known right." The court in this case omitted the word "intentional" in his definition as contained in the charge. . .

The key element of waiver is "intent." *Massachusetts Bonding and Insurance Co. v. Orkin Exterminating Company,* 416 S.W.2d 396 (Tex.1967); *Kennedy v. Bender,* 104 Tex. 1497, 135 S.W. 524 (1911); *Heinrich v. Wharton County Livestock, Inc.,* 557 S.W.2d 830 (Tex.Civ.App.—Corpus Christi

1977, writ ref'd n. .r. e.); *Rio Delta Land Company v. Johnson,* 475 S.W.2d 346 (Tex. Civ.App.—Corpus Christi 1971 writ ref'd n. r. e.); *Ferrantello v. Paymaster Feed Mills,* 336 S.W.2d 644 (Tex.Civ.App.—Dallas 1960, writ ref'd n. r. e.); 60 Tex.Jur.2d Waiver § 7 (1964).

The court erred in giving a definition of waiver that omitted the essential element of intent.

In view of our holding, it would be inappropriate to discuss further the many points of error and cross-points urged by the parties. It would also not be proper to discuss the credits and offsets urged by the parties.

We do point out that we have carefully considered the appropriateness of a partial remand and partial retrial as permitted in limited cases under Tex.R.Civ.P. 434. We have concluded that a partial remand would not be proper.

Judgment of the trial court is reversed, and the cause is remanded for a new trial.