## AMERICAN BANCSHARES MORTGAGE COMPANY, INC., Plaintiff-Appellee,

v.

## EMPIRE HOME LOANS, INC., Defendant-Appellant.

### No. 76–1879.

United States Court of Appeals, Fifth Circuit.

March 2, 1978.

---

Jon W. Zeder, Miami, Fla., for defendant-appellant.

Richard M. Dunn, Miami, Fla., for plaintiff-appellee.

Before COLEMAN and FAY, Circuit Judges, and KING,* District Judge.

* District Judge of the Southern District of Florida, sitting by designation.

COLEMAN, Circuit Judge.

This Florida-based diversity action was brought by American Bancshares Mortgage Company, Inc., ("American"), a Florida construction loan lending institution, against Empire Home Loans, Inc. ("Empire"), a Georgia mortgage banking company. The suit was grounded on Empire's failure to purchase a construction mortgage which it had contracted to buy from American. The District Court tried the case without a jury, found for American, and ordered that it be paid $873,941.97 by way of *specific performance* of the contract. It was further decreed that if Empire did not pay the sum specifically ordered then it was to be cast in damages for $884,288.72.

If there is an adequate remedy at law, equity should not be invoked. As to the amount of damages alternatively ordered, the record fails to support the award. We therefore reverse and remand for further proceedings.

On December 18, 1973, Empire issued its permanent loan commitment to John Zanetti and Mario Garcia ("Borrowers") in the amount of $1,150,000 for the building of a housing project known as Riverland Village Park, located in Fort Lauderdale, Florida. To obtain the funds to finance its commitment, Empire then solicited American to provide interim construction financing for the project. American agreed to provide interim financing in the amount of $750,-000. The loan was for twelve months but obligated Empire to purchase the loan at any time upon American's option and tender. On January 25, 1974, American issued its $750,000 commitment to the Borrowers, and it was duly accepted.

Empire, American, and the Borrowers entered into a Tri-Party Agreement to formalize all representations. It called for American to loan the Borrowers funds to construct the duplex units on land owned by the Borrowers. The Borrowers executed a note to American, secured by a mortgage encumbering the land and the project to be constructed thereon. The parties agreed that upon expiration of twelve months from the signing date, "or sooner", and "notwith-standing anything contained within Empire's commitment letter [to the Borrowers] pertaining to the state of completion of the improvements", American should tender to Empire an unconditional assignment of the construction mortgage, without covenants or warranties, and without recourse on American, and upon proper tender Empire would pay American the full amount of the principal outstanding and any accrued interest. On March 20, 1974, the Tri-Party Agreement had been executed by all parties, the construction mortgage documents were completed, and the loan was closed except for funding.

From the execution of the agreement until November, 1974, American funded the Borrowers to the extent of $673,254.73. On November 5, 1974, American notified Empire in writing that it was calling upon Empire to comply with its agreement to purchase the construction mortgage loan. The documents relating to the mortgage were sent shortly thereafter. Because it did not have sufficient funds available, Empire defaulted on its agreement to purchase.

Starting on January 22, 1975, American renewed its funding of the project. It disbursed an additional $76,745.27 to the Borrowers, thereby bringing the total sum loaned to $750,000, as was the original agreement. The additional construction mortgage advance was for the purpose of mitigating American's damages sustained because of Empire's breach. The additional funds were sufficient to complete the project and secure certificates of occupancy from the city.

The Borrowers defaulted on their loan agreement and have not paid American any of the $750,000 principal or interest. American made some attempt to sell the construction mortgage loan to three investors. Working with the Borrowers, it also attempted to sell the housing units to individual purchasers, but this was unsuccessful. The units were rented, however, to tenant occupants, thus, generating a source of income to offset some of American's expenses.

American at all times was the owner of the construction mortgage, promissory note and related documents. It has not sued the Borrowers on the promissory note nor has it initiated any type of foreclosure proceedings on the underlying mortgage.

At trial, the District Court ruled that American has no adequate remedy at law. Further, because of the problems and potential controversy involved, the Court stated that American should not be required to sue the Borrowers on the note or foreclose the mortgage in order to determine any deficiency which Empire might owe American. It further held that remedies against the Borrowers would be available to Empire once it repurchased the mortgage and notes; the suit on the note or foreclosure of the mortgage was not a condition precedent to Empire's obligation to buy the papers from American.

The Court ordered Empire to specifically perform by purchasing the construction loan papers for the principal, plus accrued interest to the date of purchase. If Empire did not specifically perform, the Court provided an alternative. It found that American was damaged to the extent of the principal of the loan, any accrued interest, and approximately $10,000 in additional damages. It ordered that if the papers were not bought then the damages should be paid.

Presumably, American could execute against assets of Empire to recover these damages without American having to turn over the construction loan papers. The decision of the District Court caused Empire to file a voluntary petition in bankruptcy. It was declared bankrupt approximately one month after the final judgment was entered in the District Court.

### Governing Principles

It is a fundamental principle of equity that if a plaintiff has an adequate remedy at law in damages, specific performance should be denied, *City of Cocoa v. Sullivan Packing Co.,* Fla.App.1964, 167 So.2d 750, 752. The threshold question is whether damages at law afford complete relief, *Le-*

*Noir v. McDaniel,* 80 Fla. 500, 86 So. 435, 438 (1920); *Biscayne Ass. v. Carson,* Fla. App.1958, 104 So.2d 871, 872. In Florida, upon a buyer's breach of a *contract to purchase land,* a seller of realty may exercise either of two remedies. He may "retain the property and sue at law for the breach of contract, recovering the difference between the price the buyer agreed to pay and the fair market value" of the property on the date of the breach, or he may sue in equity to require the buyer to perform by accepting the deed and paying the contract price. *Clements v. Leonard,* Fla.1954, 70 So.2d 840, 843. Granting specific performance rests within the sound discretion of the trial court. *White v. Cohn,* 137 Fla. 501, 188 So. 581 (1939); *Richardson, Inc. v. Carlton,* 140 Fla. 229, 191 So. 433 (1939).

The point here is that this case does not involve the sale of land. It involves the sale of loan papers, secured by a mortgage on realty.

When the value of non-real property is uncertain, or not readily ascertainable in the open market, or if the damages resulting from the breach of contract are too uncertain or indefinite to be fixed, specific performance is an appropriate remedy. *Hogan v. Norfleet,* Fla.App.1959, 113 So.2d 437, 439. Even so, American introduced no evidence at trial as to the actual value of either the loan papers or of the real property pledged for security. The few unsuccessful, rather casual, attempts to sell either the papers or the property cannot support a finding that the land, and the improvements costing $750,000, were altogether of no value.

We think the trial court fell into three errors in arriving at the result it reached in this case.

First, the Court held that American had no remedy at law. Had American sued the Borrowers on the note and foreclosed the mortgage, it could then have sued Empire for the deficiency, plus any additional expenses. Failing to do this, American could have proved injury by showing the value of the mortgage papers and the value

of the property at the time of the breach. American chose not to do this. It failed to show the inadequacy of its remedy at law. There should have been no grant of specific performance without such a showing.

█ Second, the trial court provided an alternate award in damages if Empire did not specifically perform as ordered. If damages could be determined, then the granting of a decree for specific performance was not in order.

█ Moreover, the Court's award of damages equaled the full amount of the loan, all accrued interest, plus incidental expenses of about $10,000. This reduced the value of the loan papers and of the real property to zero. There was no substantial evidence that the housing units and the land on which they stood were worthless. Indeed, to say the least, such a showing would have been a rather astounding feat. This award not only provided American with a greater recovery than the loan could have been purchased for if Empire specifically performed but it also allowed American the opportunity to keep the loan papers and the security.

█ Finally, as a reason for granting specific performance, the trial court observed that American would be inconvenienced by pursuing foreclosure or suing the Borrowers on the loan note. These remedies, the Court reasoned, could as well be followed by Empire after purchasing the loan. Neither the District Court nor American cited any authority for awarding specific performance to avoid inconvenience and our independent research has discovered none. Any reasonable costs and damages suffered by American in the pursuit of its remedies would be an item for recovery against Empire.

We are of the opinion that the District Court should reappraise its award of specific performance in this case.

Moreover, the value of the loan papers and of the underlying value of the security must be determined as of the time of the breach. On the face of it, that value could hardly be reduced to zero, as happened here.

The Judgment of the District Court is reversed and the cause will be remanded for further proceedings not inconsistent herewith.

REVERSED and REMANDED.