916 F.2d 997
 The FEDERAL DEPOSIT INSURANCE CORP., as Manager of the
Federal Savings and Loan Insurance Corporation Resolution
Fund as Statutory Successor to the Federal Savings and Loan
Insurance Corporation As Receiver for FirstSouth, F.A.,
Successor in Interest to FirstSouth Federal Savings Bank,
Atlantic Permanent Federal Savings & Loan, First Federal
Savings Bank of Tennessee, and Citizens Bank, Plaintiffs-Appellants,
v.
CONNECTICUT NATIONAL BANK, As Successor in Interest to
Jefferson Federal Savings & Loan Association, Goldome
Mortgage Corp., and TransOhio Savings Bank, F.S.B., As
Successor in Interest by Merger to Citizens Federal Savings
& Loan Association of Cleveland, Defendants-Appellees.
 No. 89-2814.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 26, 1990.
Rehearing Denied Nov. 21, 1990.
 
 Steven J. Watkins, Daniel J. Kasprzak, Calvin, Dylewski, Gibbs, Maddox, Russell & Verner, Houston, Tex., for Newport News, etc., et al.
 Albert C. Maule, Hopkins & Sutter, Chicago, Ill., for Federal Deposit Ins. Corp.
 Jordan Luke, Office of Gen. Counsel (FHLBB), Washington, D.C., for Federal Home Loan Bank Bd.
 Bruce A. Cohen, Dechert, Price & Rhoads, Washington, D.C., for Jefferson, Citizens & Transohio.
 Harvey Bartle, III, Dechert, Price & Rhoads, Philadelphia, Pa., for Connecticut Nat. Bank.
 W. Ted Minick, Mark Goranson, Winstead, Mcguire, Sechrest & Minick, Houston, Tex., for Goldome Sav. Bank.
 Appeals from the United States District Court for the Southern District of Texas.
 Before KING, GARWOOD and SMITH, Circuit Judges.
 KING, Circuit Judge:
 
 
 1
 In this suit brought by construction lenders to enforce a "take-out" agreement by four putative permanent lenders, the district court granted summary judgment in favor of the permanent lenders, finding that the permanent lenders had been absolved, by reason of a breach by the borrower under the construction loan, from their responsibility to fund the permanent loan. Alternatively, the district court found that even if the permanent lenders had not been absolved from their funding responsibility and, indeed, had breached it, the construction lenders (who had loaned in excess of $12,000,000 to the borrower) had incurred no damages because they had obtained on foreclosure property with an approximate value of $5,000,000, which was more than they were entitled to obtain under the court's construction of the take-out agreement. The construction lenders appeal, and we reverse.
 
 I.
 
 2
 In 1983, Atrium Residences Company (Atrium) planned to construct a multi-story condominium project in Webster, Texas. FirstSouth Federal Savings Bank (FirstSouth)[1] agreed to make a $12,240,000 construction loan conditioned upon Atrium obtaining permanent financing for the project. A take-out agreement, styled "Multi-Party Agreement" (the Agreement), was drafted for this purpose and signed by FirstSouth, as the Construction Lender and as one of the permanent lenders, and by the predecessors of Goldome Mortgage Corporation (Goldome), Connecticut National Bank (Connecticut) and TransOhio Savings Bank, F.S.B. (TransOhio), the other permanent lenders (Goldome, Connecticut and TransOhio being herein collectively called the Permanent Lenders). The Agreement, while in some respects not a model of clarity, is the soul of brevity--four and one-half pages. As the district court summed up the situation: "The underlying premise of the [A]greement is FirstSouth's construction loan to Atrium on the condition that permanent financing of the unsold portion [of the project] 24 months after the closing date of the construction loan is arranged to discharge the construction loan."
 
 
 3
 In June 1984, Atrium allegedly diverted $500,000 in construction funds from the project, a breach of the construction loan. FirstSouth notified the Permanent Lenders of the breach on June 7, 1984. Referencing paragraph 6 of the Agreement, FirstSouth advised the Permanent Lenders that they had the right, within 10 days of receipt of the notice, to purchase the construction loan at par, plus accrued interest, or to agree that the breach would not affect such lenders' agreement to fund the permanent loan. FirstSouth asked that each Permanent Lender advise it of which option it chose within 10 days. Absent from the notice is any description of the nature of the breach or, more significant in view of the terms of paragraph 6, what remedy FirstSouth intended to pursue against Atrium under the terms of the construction loan. Goldome reaffirmed its commitment. TransOhio claimed that it was absolved from its commitment for a reason unrelated to this appeal. Connecticut asked for more information, but advised that it should be considered dubitante. According to FirstSouth, Atrium's default was subsequently cured.
 
 
 4
 In March 1985, Atrium completed the condominium project. Alas, none of the condominiums had been sold. FirstSouth then called upon the Permanent Lenders to provide the permanent financing necessary to take-out FirstSouth. In the two-year interval between the execution of the Agreement and the call by FirstSouth upon the Permanent Lenders to honor their obligations thereunder, the value of the condominium project, like the value of virtually all Texas real estate, plummeted. The Permanent Lenders refused to fund and claimed that they were no longer obligated to do so. Because of the lack of permanent funding and Atrium's inability to repay the construction loan, in August 1985, FirstSouth foreclosed and purchased the project at foreclosure. FirstSouth then tried to collect the balance of the loan from Atrium, precipitating the bankruptcies of Atrium and its guarantors. On September 16, 1985--relying on diversity jurisdiction--FirstSouth filed the instant suit in the district court against the Permanent Lenders for breach of contract (specifically, the Agreement) and damages in excess of $7 million. An amended complaint was filed subsequent to FirstSouth's own receivership.
 
 
 5
 In late 1988, Goldome filed a motion for summary judgment. For purposes of summary judgment, Goldome assumed that it was still committed under the Agreement but claimed that FirstSouth had failed to sustain any damages by virtue of Goldome's breach. Additionally, Connecticut and TransOhio filed a joint motion for summary judgment. They asserted that they were relieved of any obligation to fund because of the June 1984 default under the construction loan. FirstSouth also filed a motion for partial summary judgment. Oral argument was heard on these motions on December 22, 1988. On June 8, 1989, the district court issued an order granting the Permanent Lenders' motions for summary judgment and denying FirstSouth's motion for partial summary judgment. The district court also denied Goldome's motion to join in the motions of the other Permanent Lenders for summary judgment.
 
 
 6
 In reaching the aforementioned conclusions, the district court stated that the issue before it was whether "under the terms of the Agreement, the default in 1984 ended the obligation of the Permanent Lenders to provide permanent funding." Although it recognized the Agreement's "silence on [this] crucial issue," the district court found the Agreement was not ambiguous. Rejecting the notion that under paragraph 6 the parties to the Agreement explicitly had to opt out of the Agreement after notification of a default under the construction loan in order not to be bound by the Agreement, the district court held that because Connecticut and TransOhio did not reaffirm their commitments under the Agreement after Atrium's default in June 1984, they possessed no further obligation to FirstSouth.
 
 
 7
 Confronting the issue addressed in Goldome's motion for summary judgment--the amount of damages for which Goldome should be held liable, assuming the continued viability of the Agreement--and the fact that Goldome had explicitly recommitted to the Agreement post the default event, the district court turned to paragraph 2 of the Agreement. Focusing on language requiring the Permanent Lenders to commit to lend the lesser of the following: 80% of the "appraised value of the remaining unconveyed portion of the property," the remaining balance of the construction loan, or $12,240,000, the district court found that the appraised value of the property was $5,000,000 at the time of foreclosure. Under paragraph 2, therefore, the district court reasoned that the Permanent Lenders would be required to fund, in toto, $4,000,000--i.e., less than the value FirstSouth gained through foreclosure. In so concluding, the district court rejected FirstSouth's argument that the term "appraised value" referred to an extant pre-construction appraisal. The district court stated that FirstSouth's reading of paragraph 2 of the Agreement would mean that FirstSouth would get "other parties to finance what it now owns." Thus, the district court ruled that no damages had been sustained by FirstSouth.
 
 
 8
 The district court's opinion also contained an alternative basis for nonliability on the part of the Permanent Lenders: it held that FirstSouth's decision to foreclose rather than enforce the Permanent loan commitment terminated all of the Permanent Lenders' obligations. Based on the aforementioned reasons, the district court granted the summary judgment motions of all of the defendants.
 
 
 9
 FirstSouth appeals.
 
 II.
 
 10
 We review grants of summary judgment in this case. In assessing a district court's determination to grant summary judgment, we review the record applying the same standards as the district court. Brooks v. United States Fire Ins. Co., 832 F.2d 1358, 1364 (5th Cir.1987), clarified on reh'g, 832 F.2d 1378. As a result, we only affirm summary judgment rulings where "we are convinced, after an independent review of the record, that 'there is no genuine issue as to any material fact' and that the movant is 'entitled to a judgment as a matter of law.' " Id. at 1364 (quoting Fed.R.Civ.P. 56(c)). "As a consequence, when a fact question controls the disposition of a summary judgment motion, we must 'review the evidence and any inferences to be drawn therefrom in the light most favorable to the non-moving party.' " Barrett Computer Serv., Inc. v. PDA, Inc., 884 F.2d 214, 216 (5th Cir.1989) (quoting Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc., 804 F.2d 879, 881 (5th Cir.1986) (per curiam)). On questions of law, of course, we make determinations de novo, just as we would outside of the summary judgment context. Id.
 
 III.
 
 11
 FirstSouth appeals the decision of the district court on a number of grounds: (A) the district court's interpretation of paragraph 6 of the Agreement; (B) the district court's interpretation of paragraph 2 of the Agreement; (C) the district court's apparent application of the contra proferentem rule of contract interpretation; and (D) the district court's holding in relation to the impact of foreclosure on the obligations of the Permanent Lenders. We address these issues seriatim.
 
 
 12
 A. The Paragraph 6 Issue.
 
 
 13
 As stated above, the district court ruled that following the default by Atrium under the construction loan and the ensuing notice of that fact by FirstSouth to the Permanent Lenders, the fact that Connecticut and TransOhio did not elect, under paragraph 6 of the Agreement, to reaffirm their commitments meant that they were no longer obligated under the Agreement.
 
 
 14
 FirstSouth contends that as a matter of law the district court incorrectly interpreted paragraph 6 of the Agreement. FirstSouth offers several grounds in support of its argument. First, it contends that the intent of the parties in signing the Agreement was to ensure the take-out of FirstSouth as the construction lender. Second, FirstSouth asserts that the district court's reading of paragraph 6 of the Agreement requires reading an additional term into paragraph 6 that relieves the Permanent Lenders of their obligation to fund in the event of a default under the construction loan. Finally, FirstSouth argues that its correspondence with the Permanent Lenders indicates that their understanding at the outset of the Agreement as to the meaning of paragraph 6 does not conform to the meaning as ascribed by the district court.[2]
 
 
 15
 Our reading of the Agreement as a whole, and paragraph 6 in particular, convinces us that the district court erred in its interpretation of paragraph 6 as relieving the Permanent Lenders of liability in the event of a default under the construction loan where such lenders do not explicitly elect to remain committed. Several factors compel our holding. Cf. Coker v. Coker, 650 S.W.2d 391, 393 (Tex.1983) ("[C]ourts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." (emphasis in original)). Initially, we note that the premises of the Agreement, as set out in paragraph 1, state that FirstSouth made the construction loan contingent upon "the availability of financing of any portion of the Project remaining unsold at the end of 24 months from the Closing Date of the Construction Loan in an amount sufficient fully to reimburse and pay the then balance of the Construction Loan...." This provision, inter alia, indicates that the parties to the Agreement were aware of the significance of their commitment as Permanent Lenders and that FirstSouth was not willing to make the construction loan in exchange for anything less than a complete and unconditional take-out commitment.
 
 
 16
 Second, we note that, consistent with the clear implications of paragraph 1, the Agreement is absolutely devoid of any conditions to the obligations of the Permanent Lenders. Remarkably, there is no condition to the Permanent Lenders' commitment that the condominium project even be completed in accordance with the plans and specifications. In fact, there is no reference to the plans and specifications. Instead, the take-out is required to occur on a date designated by Atrium and FirstSouth within the Closing Term, defined in paragraph 2 of the Agreement as not earlier than 12 months or later than 25 months after the closing date of the construction loan.
 
 
 17
 We turn to paragraph 6 itself. We note that while the Agreement may be brief, it suffers from an embarrassment of riches in terms of paragraph 6, since there are two paragraphs numbered "6." The dispute is over the second such paragraph which reads as follows:
 
 
 18
 6. No Restriction on FIRSTSOUTH's Other Remedies. Nothing herein shall be construed to restrict or modify FIRSTSOUTH's right to pursue any remedy or exercise any right to which it may be entitled under any documents held by it in connection with the Construction Loan in the event of a default thereunder; provided, however, that prior to pursuing any such remedy or exercising any such right, FIRSTSOUTH will notify the other Permanent Lenders of the event of default and the other Permanent Lenders shall have the right, but no obligation, within ten days of receipt of such notice (a) to purchase the Construction Loan at a price equal to the principal balance with accrued interest owing thereon at the date of purchase or (b) to agree that the event of default would not affect the Permanent Lenders' agreement to fund the Permanent Loan and, if requested by FIRSTSOUTH, to amend the commitment accordingly. The provisions of this paragraph are intended solely for the benefit of FIRSTSOUTH and the other Permanent Lenders and shall not extend any rights to the Borrower. (Emphasis added).
 
 
 19
 We begin our analysis of paragraph 6 by focusing on its heading ("No Restrictions on FIRSTSOUTH's other remedies") and on the portion of paragraph 6 ahead of the disputed proviso, both of which indicate that paragraph 6 was designed to benefit FirstSouth by giving it the maximum flexibility to deal with defaults under the construction loan. We note that there is no requirement in paragraph 6 or elsewhere in the Agreement that FirstSouth even give notice to the Permanent Lenders of the existence of any default under the construction loan. It is only if FirstSouth elects to pursue a remedy against the Borrowers under the construction loan in the event of such a default that any notice requirement to the Permanent Lenders exists. We then confront the "but no obligation" language. The district court construed those three words as relieving the Permanent Lenders of their obligation to fund in the event that paragraph 6 becomes operative and FirstSouth gives notice of a default. The court held that since Connecticut and TransOhio had been notified of a default and had not exercised either option provided in paragraph 6, they had no further obligation under the Agreement. We conclude that there are several defects, both factual and theoretical, in this construction of paragraph 6.
 
 
 20
 Factually, FirstSouth notified the Permanent Lenders of the existence of a default, not of its intention to pursue a remedy or exercise any right under the latter notice that paragraph 6 contemplates. Additionally, as a matter of theory, if the "but no obligation" words are read to release the Permanent Lenders from their otherwise unconditional commitment, then FirstSouth has only to avoid taking any action to remedy a default under the Construction Loan to keep the Permanent Lenders engaged. This may work to the detriment of the Permanent Lenders, since the exercise of remedies under the construction loan may be in their best interests (as well as in the best interests of FirstSouth). We do not think that the words "but no obligation" will bear the heavy weight construction imposed by the district court, i.e., that they provide an "out," in an otherwise unconditional agreement, for any Permanent Lender who fails to recommit upon receiving notice of a default under the Construction Loan. If the parties had intended this drastic result, we think they would have said so more plainly and in a way not so easily circumvented by FirstSouth, particularly in the light of the balance of the Agreement. Cf. Coker, 650 S.W.2d at 393 ("No single provision, taken alone, will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.").
 
 
 21
 B. The Paragraph 2 Issue.
 
 
 22
 FirstSouth alleges that the district court incorrectly interpreted paragraph 2 of the Agreement when it found that FirstSouth suffered no damages because of Goldome's refusal to lend. The district court concluded that paragraph 2 of the Agreement required the Permanent Lenders to fund no more than 80% of the condominium project's appraised value on the date they funded the permanent loan. The district court reasoned that because FirstSouth paid the property's appraised value on the foreclosure date, and received 100% of its value, FirstSouth suffered no damages as a result of the Permanent Lenders' refusal to fund 80% of the appraised value.
 
 Paragraph 2, in relevant part, states:
 
 23
 Permanent Lender's Agreement to Lend. Not earlier than twelve (12) months or later than twenty-five (25) months after the closing date of the Construction Loan ("the Closing Term"), upon presentation to the Permanent Lenders of promissory notes in form as attached hereto as Exhibit B duly executed by or on behalf of the Borrower, proportionately secured by a deed of trust on the property described in Exhibit A (or the portion thereof which at the time of closing of the Permanent Loan has not been conveyed to purchasers by the Borrower) for an aggregate sum not to exceed the lesser of 80% of the appraised value of the remaining unconveyed portion of the property described in Exhibit A hereto, the balance due on the Construction Loan or $12,240,000.00 with each of the Permanent Lenders participating in making the Permanent Loan in the respective amounts (which amounts may be proportionately adjusted to equal the amount of the Permanent Loan), for the term and at the rates of Interest shown on Exhibit C hereto, which Exhibit by this reference thereto is hereby incorporated herein as though fully set forth.... This agreement of the Permanent Lenders to make the Permanent Loan to the Borrower will hereinafter be sometimes referred to as "the Permanent Commitment." (emphasis added).
 
 
 24
 FirstSouth contends that the phrase "appraised value" in paragraph 2 refers to a $15,300,000 valuation rendered prior to the project's construction.[3] This preconstruction market study and appraisal was the only valuation ever performed on the condominium project, FirstSouth observes, and only by interpreting paragraph 2 as referring to this valuation do the surrounding paragraphs make sense. Paragraph 1 proclaims, inter alia, that the Agreement aims to ensure financing "in an amount sufficient fully to reimburse and pay the then balance of the Construction Loan, if required," and paragraph 3(iii) requires FirstSouth to release its rights under the note only "when it has received the full amount due thereon" or a price equal to the unpaid principal balance.[4] See Coker, supra.
 
 
 25
 In opposition, Goldome argues that FirstSouth cannot contend on appeal that the Agreement is ambiguous because FirstSouth, in its pleadings, asserted that the Agreement unambiguously supported its construction of the contract. See, e.g., Ross v. Burleson, 274 S.W.2d 105, 107 (Tex.Civ.App.1954, no writ) ("An ambiguity in a contract must be raised by the pleadings and in the absence of such a pleading the court will not hear evidence as to the intention of the parties which is different from that expressed in the contract."); Gulf & Basco Co. v. Buchanan, 707 S.W.2d 655 (Tex.Civ.App.1986, writ ref'd n.r.e.). Goldome also contends that had the parties meant to refer to the preconstruction "market study and appraisal" in the relevant clause of paragraph 2 of the Agreement, they would have done so explicitly. Furthermore, Goldome argues, FirstSouth's interpretation of the three options for payment contained in paragraph 2 makes the first two options synonymous. Eighty percent of the appraised value of the remaining unconveyed condominiums, Goldome urges, and the balance due on the construction loan would always be the same amount. Thus, "appraised value" in paragraph 2, it argues, should be construed as referring to the foreclosure valuation of $5,000,000.
 
 
 26
 FirstSouth observes that, consistent with our standard of review, we do not have to agree fully with its construction of the Agreement in order to find that the district court's grant of summary judgment in favor of Goldome was inappropriate. If its construction was possible, FirstSouth argues, that is, if the Agreement did not unambiguously support the district court's construction, the district court should have resolved the issue as a question of fact rather than grant summary judgment. See Steuber, supra; but see Sale v. Contran Corp., 486 S.W.2d 161, 165 (Tex.Ct.Civ.App.1972, writ ref'd n.r.e.) (Court affirmed grant of summary judgment in face of plaintiff's argument that it was inappropriate on account of contract ambiguity because it found ambiguity had not been pleaded and because of its application of the rule "that words of doubtful meaning must be construed strictly against the party who selected the language." (footnote omitted)). We agree with FirstSouth that the district court's grant of summary judgment was improvident if the Agreement did not unambiguously support Goldome's construction. FirstSouth's argument, we note, is not equivalent to claiming that the Agreement is ambiguous, and we do not find FirstSouth's contention untimely.[5]
 
 
 27
 We must also reject Goldome's contention that if the parties meant to refer to the preconstruction "market study and appraisal" in the relevant clause of paragraph 2 of the Agreement, they would have done so explicitly. No other appraisal had been performed on the property, and the Agreement provides for no other appraisal. In fact, Goldome's argument appears to cut the other way. Had the parties intended the phrase "appraised value" to require an additional appraisal, the Agreement would have contained a covenant specifying the party responsible for obtaining the appraisal and the timing thereof and apportioning its cost. The requirement for a second appraisal, if it existed, must be inferred entirely from the phrase "appraised value," although an appraised value already existed.
 
 
 28
 Nor do we accept Goldome's argument that the first two funding options under paragraph 2 are synonymous if we construe "appraised value" to refer to the preconstruction appraisal. Paragraph 2 required the Permanent Lenders to fund "an aggregate sum not to exceed the lesser of 80% of the appraised value of the remaining unconveyed portion of the property ..., the balance due on the Construction Loan, or $12,240,000.00...." This clause obligated the Permanent Lenders to fund the lesser of: (1) 80% of the appraised value of the unsold units, (2) the balance due on the construction loan, or (3) $12,240,000.00, the original amount of the construction loan.
 
 
 29
 The parties contemplated, Goldome argues, that the construction loan would be repaid partially from the sale of a portion of the units and that the loan balance would be proportionately reduced. If the original appraisal were intended to provide the "appraised value," therefore, "80% of the appraised value of the remaining unconveyed portion of the property," and the "balance due on the Construction Loan" would be equivalent. Such a construction must be rejected, Goldome contends, because a contract should be construed whenever possible in a manner that gives effect to all of its provisions and ensures that none are rendered meaningless. We find this argument unconvincing.
 
 
 30
 The parties may have contemplated, among other contingencies, that accrued interest could cause the obligations under the two options to vary; or that the Borrower might not draw down the total amount of the construction loan; or that some units might be sold without a proportionate reduction in the loan balance; or that some units might be sold for prices in excess of the respective appraised values and the entire sales proceeds applied to reduce the construction loan balance. We recognize that under many circumstances options one and two would yield equivalent obligations. This fact does not render FirstSouth's construction of the Agreement a nullity, however, because the parties reasonably may have anticipated that under certain circumstances the two options would vary.
 
 
 31
 The three options in paragraph 2 appear to provide for three distinct situations. The first option contemplates a reduction in the amount due at closing because some units were sold. The second option allows the Permanent Lenders to fund the "balance due on the construction loan" because the borrower paid some portion of the loan. The third option requires the Permanent Lenders to fund their share of the original $12,240,000 construction loan.
 
 
 32
 Arguably, only option three applied under our facts because no units were sold and no payments made on the principal balance. If this construction is correct, an "appraised value" for the "remaining unconveyed portion " of the property arguably was not required because no "remaining unconveyed portion " of the property existed. (Emphasis added). The entire property remained unconveyed and the rationale for using option one did not exist.
 
 
 33
 Even if the Permanent Lenders retained the option of funding "80% of the appraised value of the remaining unconveyed portion of the property," although no portion had been conveyed, we cannot agree that the phrase "appraised value" necessarily required a second appraisal. Goldome argued, and the district court apparently accepted, that the phrase "appraised value of the remaining unconveyed portion" could not refer to the market study and appraisal because that appraisal did not provide a value for each unit. No method existed, therefore, absent a second appraisal, to determine the value of 80% of "the remaining unconveyed portion of the property" once some of the units were conveyed.[6] So stated, the defect in this argument becomes apparent--no units were conveyed. A second appraisal, therefore, was not required in order to determine the "appraised value" for the property.[7]
 
 
 34
 We cannot conclude that the specific language of option one unambiguously required a second appraisal, and the economic structure of the Agreement as a whole confirms this conclusion. Under the district court's construction, the two words "appraised value" served to shift the risk of a decline in market value onto FirstSouth. The district court places this heavy significance on these two words although the remaining portions of the Agreement contain no protections for the Permanent Lenders but only for FirstSouth. The Agreement's conspicuous lack of provisions protecting the Permanent Lenders indicates that the Agreement's sole purpose was, as the Agreement states, to ensure that the Permanent Lenders would take out the entire remaining balance on the construction loan at the time the loan was funded.
 
 
 35
 The Agreement contains a clause conditioning the Permanent Lenders' obligation to fund on the "limitations herein set forth." This clause at first blush appears to protect the Permanent Lenders. The only condition precedent to their obligation to fund the loan, however, is the receipt of proper documentation. Even this condition, we note, did not allow the Permanent Lenders to withhold funding. FirstSouth had the option under the Agreement to "execute, deliver and perform, for and in Borrower's name ... any and all of the instruments and conditions prerequisite to the funding of the Permanent Loan...." Significantly, as we noted above, the Permanent Lenders' obligation to fund the loan was not even made contingent on the Borrower's completion of the project according to plans and specifications.
 
 
 36
 The surrounding paragraphs confirm the conclusion that the parties agreed for the Permanent Lenders to take out the entire balance remaining on the construction loan. The Agreement's purpose, according to paragraph 1, is to ensure financing "in an amount sufficient fully to reimburse and pay the then balance of the Construction Loan, if required," and paragraph 3(iii) requires FirstSouth to release its rights under the note and security agreements only "when it has received the full amount due thereon" or a price equal to the unpaid principal balance. If FirstSouth was to receive only $4,000,000 on closing, as the district court concluded, paragraphs 1 and 3 of the Agreement were meaningless because the Permanent Lenders were required to fund neither the unpaid principal balance nor the amount due on the construction loan.
 
 
 37
 When viewed in light of the contract as a whole, we cannot agree with the district court that the two words "appraised value" required a second appraisal when the Permanent Lenders funded the loan.[8] The district court's construction radically alters the economic relationship between the parties as contemplated by the remaining portions of the Agreement and is not compelled by the specific language of paragraph 2. Because the Agreement does not unambiguously support such a construction, we must reverse the district court's grant of summary judgment in favor of Goldome on this issue.
 
 
 38
 C. The Contra Proferentem Rule of Interpretation.
 
 
 39
 The Construction Lender objects to the district court's unqualified statement in its memorandum opinion that contracts should be construed against those who draft them and the apparent application of such policy in the instant case. We recognize the policy as a valid and important one, but agree with FirstSouth's contention that it is not necessary to apply it in the case at hand. As Corbin states in his treatise on contracts:
 
 
 40
 It is frequently said that this rule [contra proferentem ] is to be applied only as a last resort. It should not be applied until other rules of interpretation have been exhausted; nor should it be applied unless there remain two possible and reasonable interpretations.
 
 
 41
 3 A. Corbin, Corbin on Contracts Sec. 559 (1960); see also N.L.R.B. v. L.B. Priester & Son, Inc., 669 F.2d 355, 364 (5th Cir.1982) ("Contracts are to be construed against the drafter only as a matter of last resort, when doubt persists 'after applying all of the ordinary processes of interpretation, including all existing usages, general, local, technical, trade and custom and agreement of the two parties with each other, having admitted into evidence and duly weighed all of the relevant circumstances and communications between the parties....," (quoting Corbin on Contracts at Sec. 559)).
 
 
 42
 We have held, see supra, that paragraph 6 of the contract in question is not ambiguous and that the Agreement does not require the Permanent Lenders to recommit following notice of an event of default in order to be bound by the Agreement. Implicit in our holding is our finding that this interpretation of the contract is the only reasonable one. Cf. United California Bank v. Prudential Ins. Co., 140 Ariz. 238, 681 P.2d 390 (1983). As we stated above, paragraph 6 cannot reasonably bear the construction urged by the Permanent Lenders. Thus, we see no need to turn to the rule of contra proferentem in resolving the case at hand.
 
 
 43
 D. The Impact of Foreclosure.
 
 
 44
 FirstSouth disputes the significance the district court accorded FirstSouth's foreclosure. The district court found that although Goldome specifically reiterated its commitment to the Agreement post Atrium's default, it was, nevertheless, released from its obligations under the Agreement because "[t]he second paragraph 6, when read with paragraphs 4 and the first 6, clearly indicates that a foreclosure terminates the obligations of all Permanent Lenders." Moreover, the district court also ruled that the foreclosure by FirstSouth constituted an alternative reason for granting summary judgment to Connecticut and TransOhio. We do not follow the reasoning of the district court.
 
 
 45
 The district court apparently interprets the foreclosure by FirstSouth as an alternative to pursuing the remedies enumerated under paragraph 4 and, therefore, as terminating all obligations on the part of the Permanent Lenders.[9] Nothing in the Agreement either implicitly or explicitly supports this reading. Paragraph 4 assigns the permanent loan commitment to FirstSouth in order to allow FirstSouth to step into Atrium's shoes and enforce the permanent loan commitment under certain conditions.[10] The first paragraph 6 elaborates certain rights accorded to FirstSouth to ensure it adequate recourse (1) in the event that Atrium either failed to comply with the terms of the Agreement in such a manner that the Permanent Loan would not be timely funded or (2) in the event that FirstSouth reasonably believed that Atrium would not timely comply with the terms of the Agreement.[11] In other words, the provisions of paragraph 4 and the first paragraph 6 aimed to enable FirstSouth to protect its interests in the event that Atrium refused or failed to close the Permanent Loan upon completion of the condominium project.
 
 
 46
 We fail to see how these provisions can be read to terminate the Permanent Lenders' obligations to fund in the circumstances at hand. In particular, we note that the funding problem in this case emanates from the Permanent Lenders' refusal to fund rather than on any lack of willingness on the part of Atrium to complete its building commitment.[12] Thus, we reject any argument based on paragraph 4 and the first paragraph 6 that the Permanent Lenders were excused from their funding commitments.
 
 IV.
 
 47
 For the foregoing reasons, we reverse the judgment of the district court in granting the summary judgment motions of the Permanent Lenders.
 
 
 48
 REVERSED.
 
 
 
 [1]
 Because FirstSouth sold a number of participating interests in the construction loan, several other savings and loan associations were also associated with the suit: Newport News Savings Bank, Atlantic Permanent Federal Savings and Loan Association, Village Savings and Loan, First Federal Savings Bank of Tennessee, and Citizens Bank. To simplify matters, we refer only to FirstSouth
 FirstSouth was put into receivership and the successor in interest was the Federal Savings and Loan Insurance Corporation (FSLIC). Subsequently, in light of recent legislation, this court has granted the motion of the Federal Deposit Insurance Corporation (FDIC) to be substituted for FSLIC as the correct party in interest. Although FDIC is the plaintiff-appellant in this suit at this point, either "FirstSouth" or the more generic term, "Construction Lender," is used herein.
 
 
 [2]
 The fact that FirstSouth, on the one hand, and the district court and the Permanent Lenders, on the other hand, differ as to the meaning of paragraph 6 suggests that paragraph 6 may be ambiguous. However, "[w]e note that virtually every case involving the interpretation of a contract comes to us with two sets of lawyers and two sets of clients with sharply differing views of the meaning of the contract. But interpreting contracts is ultimately the business of the courts." Broad v. Rockwell Int'l Corp., 642 F.2d 929, 948 (5th Cir.1981) (en banc), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380. The determination as to whether a contract suffers from ambiguity is a legal issue. Steuber Co., Inc. v. Hercules, Inc., 646 F.2d 1093, 1098 (5th Cir.1981); see, e.g., Technical Consultant Serv. Inc. v. Lakewood Pipe of Tex., Inc., 861 F.2d 1357, 1362 (5th Cir.1988) ("Under Texas law, interpretation of an unambiguous contract is a question of law."); Battig v. Hartford Accident and Indemnity Co., 608 F.2d 119, 120 (5th Cir.1979) ("Absent latent or patent ambiguities, the meaning of the contract is for the court as a matter of law."). In making the determination whether a contract is ambiguous, we must assess whether a contract "is reasonably open to just one interpretation given the rules of construction and the surrounding circumstances." Technical Consultant Serv., 861 F.2d at 1362. If we deem the Agreement--or a portion thereof--ambiguous, its interpretation becomes a factual question on which--given the complexity of the case--summary judgment is inappropriate. Cf. Steuber Co., Inc., 646 F.2d at 1098 ("[O]nce it is determined that a contract is ambiguous, the determination of the actual intent of the parties becomes a factual question.")
 
 
 [3]
 FirstSouth alleges that this evaluation was a "preconstruction appraisal." Goldome argues, however, that such valuation was simply a "market-study." The portion of the valuation included in the record is captioned, in relevant part, "the market study and appraisal[.]" Moreover, the document contained over 160 pages of appraisal and broke down its estimates by type of condominium unit. Thus, we find ourselves in agreement with the district court's characterization of the pre-construction evaluation as an appraisal
 
 
 [4]
 Paragraph 3(iii) states:
 FIRSTSOUTH will execute full releases of its rights under the deed of trust securing the Construction Loan and will execute any other releases and termination of liens, mortgages, guaranties, security interests or other rights which it holds in connection with the Construction Loan when it has received the full amount due thereon, which such releases and terminations to be in form satisfactory to the Permanent Lenders and the Borrower....
 
 
 [5]
 FirstSouth continues to contend that the relevant portion of paragraph 2 of the Agreement unambiguously refers to the market study and appraisal
 
 
 [6]
 We accept this assertion arguendo although the body of the market study and appraisal has not been included in the record and we therefore cannot determine its validity
 
 
 [7]
 Even were we to accept the argument that, although no units had been conveyed, the first option under paragraph 2 required an appraisal at the time the Permanent Lenders funded the loan, we still would not be able accept the district court's conclusion that a foreclosure sale appraisal satisfied this requirement
 
 
 [8]
 If the district court could not clearly ascertain from the four corners of the contract that "appraised value" required a second appraisal when the Permanent Lenders funded the loan, it should have examined evidence regarding the intent of the parties and circumstances existing at the time they executed the contract. Goldome offered no such evidence. FirstSouth, however, offered the deposition testimony of the loan officer at FirstSouth who originated the construction loan. The officer stated that each of the Permanent Lenders, including Goldome, committed themselves to make a $3,050,000 loan (25% of 80% of $15,300,000 evaluation) unless the loan balance had been reduced
 
 
 [9]
 The relevant analysis by the district court states:
 Goldome agreed and is therefore bound by its decision to exercise an option under the second paragraph 6. However, this commitment is of no significance because the Agreement sets forth the manner that FirstSouth is to enforce the permanent loan commitment [sic]. Paragraph 4 provides that if the Borrower defaults in the performance of a condition precedent to the making of the Permanent Loan, FirstSouth may proceed in the name of the Borrower to close the loan in the Borrower's name. The Court construes this to imply that the Borrower has completed the construction for some reason has not complied in some respect with paragraph 3, FirstSouth opted to foreclose and cut-off the rights of the Borrower instead of proceeding under paragraph 4 [sic].
 The second paragraph 6, when read with paragraphs 4 and the first 6, clearly indicates that a foreclosure terminates the obligations of all Permanent Lenders. Therefore, even if the obligations of the Permanent Lenders survived the Borrower's default, foreclosure by FirstSouth terminated all obligations.
 
 
 [10]
 Paragraph 4 contains the following provision:
 The Borrower hereby sells, assigns, transfers and sets over the Permanent Commitment, to the extent herein called for, to FIRSTSOUTH for the purpose of complying therewith for and in the name of the Borrower should it default in the performance of the conditions precedent to the making of the Permanent Loan as required in the Permanent Commitment, and FIRSTSOUTH shall have the right to execute, deliver and perform, for and in Borrower's name, at FIRSTSOUTH's option, any and all of the instruments and conditions prerequisite to the funding of the Permanent Loan in accordance with the Permanent Commitment, including without limitation execution of promissory notes, deeds of trust, security agreements, or loan agreements in such form and containing such covenants as may be required by the other Permanent Lenders, or modifications of or amendments to any such instruments, all of which FIRSTSOUTH is hereby authorized to do by the Borrower, for it and its name and stead as its attorney-in-fact and agent, and all of FIRSTSOUTH's actions in the premises are hereby ratified and confirmed. This power is coupled with an interest and may not be cancelled or revoked by the Borrower.
 
 
 [11]
 The text of the first paragraph 6 reads as follows:
 If, in the exercise of its reasonable judgment, there is a failure by the Borrower to comply with the terms of the Permanent Commitment so as to have the Permanent Loan timely funded, or an indication that Borrower will not have timely complied therewith, FIRSTSOUTH shall have the right, but not the obligation, either:
 (a) With the approval of the other Permanent Lenders and upon such terms and conditions as they may require, to extend the time for the Closing Data and the terms of the Permanent Commitment; and/or
 (b) FIRSTSOUTH may, independently, complete the conditions precedent to the funding of the Permanent Loan as expressed in the Permanent Commitment and upon execution of the documents by or on behalf of the Borrower (which the Borrower firmly commits and binds itself to execute upon presentation) to close the Permanent Loan.
 Borrower agrees fully to reimburse FIRSTSOUTH (for any costs or expenses which it may incur in the performance of either of the options granted to it in this paragraph.
 
 
 [12]
 Additionally, we note that the foreclosure by FirstSouth appears to have been an attempt on FirstSouth's part to mitigate its damages. It is horn book law that "a party who has been wronged by a breach of contract may not unreasonably sit idly by and allow damages to accumulate." J. Calamari & J. Perillo, Contracts 538 (2d ed. 1977) (footnote omitted). We do not fault FirstSouth for trying to protect its interests in this manner. Cf. American Bancshares Mortgage v. Empire Home Loans, Inc., 568 F.2d 1124, 1127 (5th Cir.1978) (When construction lender--who had not foreclosed on mortgage--sued Permanent Lender who had defaulted on loan commitment, the court awarded damages but stated that "[h]ad [plaintiff] sued the Borrowers on the note and foreclosed the mortgage, it could then have sued [the defendant] for the deficiency, plus any additional expenses.")